PRICE, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 8—March 4, 1919.*

*Constitutional law: Regulating practice of optometry: Police power: Ex post facto law: Due process of law: Classification: Persons exempted: Discrimination in favor of nonresidents: Evidence of violation of law: Who may hold themselves out as qualified: Statute construed.*

1. The practice of optometry has a real and direct bearing upon the public health and calls for special skill and knowledge; and sec. 1435*f*—35, Stats. 1917, regulating such practice and limiting it to persons duly licensed as therein prescribed, is a valid exercise of the police power.
2. The fact that said statute prevents many who were engaged in the practice of optometry at the time of its enactment from continuing therein does not render it void as an *ex post facto* law; nor is the statute invalid on the ground that it deprives any person of property without due process of law.
3. Said statute is not invalid because it permits persons to select their own glasses although harm may result from such selection. An attempt of the legislature to suppress or minimize an evil is not to be condemned because it does not entirely eradicate it.
4. As to matters of classification the legislature has a very broad discretion and its judgment with reference thereto will be respected and enforced by the courts unless the classification is so arbitrary that there is no conceivable basis in reason therefor.
5. Said statute is not rendered invalid by the fact that physicians and surgeons, and persons who sell spectacles without attempting to test the eyes, are exempted from its provisions.
6. The provision in said law that the board of examiners may permit to practice optometry in this state any person who has been admitted to such practice in another state, upon production of a certificate showing that he has passed an examination in such other state and has actually practiced optometry therein for a term of two years, does not improperly discriminate against residents of this state or render the law invalid.
7. The evidence in this case, showing, among other things, that defendant tested the eyes of a patient by means of a "big frame," different lenses, and a card with different sized letters thereon, until he found that her eyes were good, and then he gave her a pair of even glasses,—is *held* sufficient to show

that he violated sec. 1435f—35, Stats. 1917, by employing "means, other than the use of drugs, for the measurement of the powers of vision and the adaption of lenses for the aid thereof."

8. After providing that every person who, not having obtained the required certificate, "shall hold himself out to the public as qualified to engage in the practice of optometry" shall be guilty of a misdemeanor, etc., the act further provides that nothing therein shall be construed to apply "to persons who shall sell spectacles from an established place of business without attempting to test the eyes." *Held,* that the act is not to be construed as permitting one who sells spectacles without attempting to test the eyes to hold himself out to the public as qualified to engage in the practice of optometry.

ERROR to review a judgment of the municipal court of Milwaukee county: A. C. BACKUS, Judge. *Affirmed.*

Plaintiff in error was found guilty in the municipal court of Milwaukee county of practicing optometry as defined in sec. 1435f—35, Stats., without first having obtained a license authorizing him so to do. He brings writ of error to review the judgment of conviction.

The uncontradicted evidence shows that on the 17th day of January, 1917, one Mrs. Helen Bauer, who had broken her glasses, called at his office to have them fixed. He was not there, and she left word to have him call at her house, which he subsequently did. He put a big frame on her face and tested her eyes. He gave one of her girls a card and she had to stand away. There were different sized letters on the card. He asked her to read the letters on the card, until finally he found that her eyes were good, and then he gave her a pair of even glasses. She paid him $2 therefor. He has a big sign on his house with his name and a picture of an eye on it.

Charles D. Waugh testified that he was secretary of the Wisconsin board of examiners of optometry; that the defendant *Price* had not been licensed to practice optometry in the state of Wisconsin, although soon after the law went into effect he appeared and took the examination on three

different occasions, failing each time. He testified that the optometrical examination consists of an examination on four different subjects, namely, anatomy and physiology of the eye and its appendages; physical and theoretical optics; practical optometry, and, in addition to that, the applicant is required to show by a practical demonstration that he understands the use of the various instruments concerning which an optometrist should be familiar. The applicant for a license to practice optometry is expected to demonstrate a knowledge of the general make-up and construction of the eye and to be able to recognize a healthy eye—that is, an eye which may properly be fitted with glasses as against an eye which should be directed to a doctor for medical attention. In other words, to differentiate between those cases which require a physician's attention and those which may be fitted with glasses without being referred to a physician. The subject of anatomy and physiology of the eye includes a knowledge of the muscles and the lids, the blood-vessels, and nerves. The applicant is expected to know the source of the blood supply, the nerve supply and its general action; the action of the nerves on the muscles, and which nerves control the action of the different ocular muscles. Physical optics is that branch of the general subject of physics which deals with light primarily, the action or effect of lenses on light, and how light is directed, reflected, and refracted. The applicant must understand the spectrum. He should know which colors of the spectrum are easy on the eyes and which rays of light are hard on the eyes. Physiological optics means the effect of lenses on the eyes, the effect of light, the different effect that lenses may have on the eye itself. In other words, physiological optics is that part of optics referring to the effect of lenses on light which enters the eyes. A man practicing optometry should know exactly what effect the different forms of lenses will have on the rays of light as they come from different directions, from different positions, from different distances, on the eyes.

Assuming that rays of light coming from twenty feet or more are parallel, the effect of these rays will be different than rays of light coming from a source within twenty feet. The rays of light will be divergent as they enter the eyes from a nearer source, and the effect on different lenses is different. A person should know all about that in order to fit a pair of glasses. If an optician is not familiar with the subject he is very apt to cause great distress to his patient by putting on a lens simply because it is not properly centered; by bending the rays of light the eye would have to turn itself to meet the rays of light as they enter the eye and the patient could thereby be caused great discomfort and perhaps permanent injury, and the patient will not be aware of it for days afterwards and perhaps for a longer period than that. An optician should not only have this fundamental knowledge, but should know how to apply it; that is, he should be able to take such knowledge and fit and grind a pair of glasses. There are four or five practical instruments with which an optometrist should be familiar. Such instruments are the ophthalmoscope, the retinoscope, the ophthalometer, the phorometer, and the trial case. The trial case consists of various lenses, and the practitioner should know how to fit a pair of glasses without asking the patient too many questions, because the patient cannot know how to intelligently answer him as to what he may see. A patient who has a slight astigmatism and also is far-sighted, if left to pick out his own glasses will almost invariably select near-sighted glasses. A near-sighted glass, before a patient of that kind, will give him seemingly better vision, but it will result in a constant eye-strain, because it will make his condition of far-sightedness and stigmatism worse. We frequently have to send away persons who do not see so well with their glasses as they do without them, knowing that the glasses are for their good and will give relief for certain conditions of which they are complaining. The final judgment as to whether the patient can see well is with the

Price v. State, 168 Wis. 603.

patient, but the final judgment as to whether or not glasses are good for the patient is not with the patient. The patient is often sent out with glasses when he says he cannot see as well with the glasses as he can without them. After it has been determined with the use of the various instruments what a patient ought to wear, for instance one of these far-sighted astigmatic cases, the proper lens is put on that man's eyes, and almost invariably he will at first not see as well with that lens as he would without the lens and not nearly so good as he could see with a near-sighted lens. If the patient were permitted to decide he would say, give me the glasses I can see through, but it would be the worst thing for that man that could possibly be done for him.

Dr. Claude S. Beebe also testified that he is a physician specializing in eye, ear, nose, and throat, who has graduated from the Wisconsin College of Physicians & Surgeons and who took post-graduate work at the New York Ophthalmic and London Eye and Ear Hospital. He testified that the patient is absolutely unable to determine himself whether or not his glasses are proper or improper. A person who is fitted with glasses never knows what his vision should be. He may have a poor sight all his life and not be in a position to know what perfect sight is until he gets correct glasses. That condition is one that is very commonly found and is a condition that is frequently prevalent among people who use their eyes a great deal. A far-sighted person or an individual who sees perfectly for a distance may still have eye-strain and not know it. In examination of school children it is found that many children who have perfect vision suffer from nervous disorders and should be wearing glasses to correct that defect. In near-sighted people who are unable to see distinctly for a distance they have an error that should be corrected, and unless they have been through a test and have been told what perfect vision is they have no idea what they should see, and when they get their glasses which are correctly fitted they for the first time realize what

other people are seeing.  In other words, they themselves cannot judge what perfect sight is, or whether a glass is correctly fitted or not.  Sight is not the determining feature always in glasses; the eye-strain, which is simply one expression of a nervous lack in the system, is corrected by a glass, and then they realize for the first time that they have had an error which they themselves had been unconscious of.  Bright's disease or kidney condition is a condition where there is a disease of the blood-vessels.  This is indicated many times very early in the disease by hemorrhages in the inside of the eye.  This, of course, interferes with vision, and they frequently go to the optometrist to have their eyes examined, thinking their defect is due to the need for glasses.  If the optometrist is versed in pathology and the other conditions that are required by the laws of this state, he should be in position to determine that this is not a case for glasses but a case of some disease and then refer that patient to the physician.  That condition could not be determined if you merely had a case or frame and put in different glasses and tested out the eye.  A delay in that matter might be serious.  If we have a nervous condition of the patient, and a refractive error, this is one of the leaks of the nervous system, and proper correcting lenses will frequently benefit the general nervous system and in that way prevent further development of epileptic condition.  These conditions of the eye may be determined by the instruments mentioned by Dr. Waugh, that is, by looking into the eye itself by the aid of these instruments.

For the plaintiff in error there was a brief by *Aarons & Niven,* attorneys, and *Armand J. Tuteur,* of counsel, all of Milwaukee, and oral argument by *Mr. Tuteur* and *Mr. Charles L. Aarons.*

For the defendant in error there was a brief by the *Attorney General, J. F. Baker,* assistant attorney general, *Winfred C. Zabel,* district attorney, and *Arthur H. Bartelt,* assistant district attorney; and the cause was argued orally by *Mr. Baker* and *Mr. Zabel.*

OWEN, J.    Plaintiff in error, hereinafter called appellant, was convicted of a violation of the statute regulating the practice of optometry, which prohibits the same withouc first having secured a license therefor, as provided by the act.    His principal defenses are (1) that he did not violate the act, in that the proof did not show he was practicing optometry as defined therein; and (2) that the act is unconstitutional.    The act was first enacted as ch. 488, Laws 1915, and, as amended by sec. 80, ch. 14, and sec. 2, ch. 357, Laws 1917, appears in the Statutes as sec. 1435*f*—35.

It seems proper first to consider whether the law is a constitutional enactment.    In this day it is but trite to say that the state may legislate in the interest of the public health and to protect its citizens from the fraud and imposition resulting from the practice of a trade or profession, calling for skill and learning, by those who are incompetent.    Statutes requiring those who hold themselves out as competent to serve the public, as lawyers, physicians, dentists, osteopaths, pharmacists, plumbers, barbers, and the like, to prove their competency before, and secure a license from, some public authority, to engage or continue in their calling, are sustained by virtue of this power.    Although the regulation of the practice of optometry is a comparatively recent idea, upwards of forty states of the Union, as we are informed by appellant's brief, have legislated upon the subject.    This is indicative of a decidedly preponderating opinion on the part of the American people on the subject and indicates that the legislation under consideration is not the product of legislative caprice.    It appears, too, that this class of legislation has received quite general acquiescence on the part of those affected thereby, as we have been referred to but two cases *(McNaughton v. Johnson,* 242 U. S. 344, 37 Sup. Ct. 178, and *People v. Griffith,* 280 Ill. 18, 117 N. E. 195) in which laws of this nature have received judicial consideration. An extended review of these cases will serve no good purpose, as in the *McNaughton Case* the power of the state of

California to enact the law was not considered, although it seems to have been assumed; and in so far as the *Griffith Case* denies the power of the state to enact such legislation we are not impressed with the logic thereof.

If the practice of optometry bears some real relation to the public health, or if it calls for special skill and knowledge on the part of those practicing it, so that the people should be protected from fakirs and incompetents who hold themselves out as competent to engage therein, then the legislation is within the power of the state. That it does have a real and direct bearing upon the public health cannot be doubted. There are many ailments that are attributable to defective eye-sight which disappear when the vision is corrected by properly-fitting glasses. To properly diagnose and prescribe for the particular defect from which the patient is suffering requires a knowledge of the anatomy of the eye as well as the subject of physical optics, being that branch of the general subject of physics which deals with the action or effect of lenses on light and how light is directed, reflected, and refracted. It also requires familiarity with the spectrum, the ophthalmoscope, the retinoscope, the ophthalmometer, and the phorometer. If this is not a matter of common knowledge, it is supplied by the expert testimony taken in the case, a portion of which is set out in the statement of facts. By a reference to this testimony we are further informed that glasses which satisfy the patient are frequently improper, and that glasses which at the time do not seem comfortable should be insisted upon. With these facts in mind, it is apparent that a person lacking in the requisite degree of skill and learning who holds himself out as competent to practice optometry might bring harm rather than benefit to those who consult and confide in him. In the interest of the public welfare and to protect the citizens from such impositions it is competent for the state to require that those assuming to practice the profession shall possess a specified minimum degree of skill and learning. The legislation is, therefore, within the police power of the state.

While this law prevents many who were engaged in the practice of optometry at the time of its enactment from a continuance thereof, it is well settled that it is not, for that reason, *ex post facto,* which is one of the grounds urged against its validity. *Hawker v. New York,* 170 U. S. 189, 18 Sup. Ct. 573; *Reetz v. Michigan,* 188 U. S. 505, 23 Sup. Ct. 390; *Nelson v. State,* 167 Wis. 515, 167 N. W. 807. Neither does it take property without due process of law, as urged. Laws similar to this, by which persons engaged in the practice of a trade or profession have been prohibited from the further pursuance thereof until their competency was demonstrated and they received a license so to do, have been frequent. The right of the legislature thus to deprive citizens of the right of pursuing their chosen callings has been fully established and universally recognized. A no more authoritative or illuminating statement upon this question can be found than the remarks of Mr. Justice FIELD in the case of *Dent v. West Virginia,* 129 U. S. 114, 9 Sup. Ct. 231, where he said:

"It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose; subject only to such restrictions as are imposed upon all persons of like age, sex, and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken. But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud. As one

means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely, their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific or otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation."

It is also suggested that the law is invalid because it permits persons to select their own glasses when, as the evidence shows, harm may result therefrom. This is akin to an argument that the law regulating the practice of medicine is void because it does not prohibit the individual from buying a standard or patent remedy for a common ailment. At the risk of dignifying the suggestion we will say, in the first place, that the legislature has not assumed to protect the individual from his own folly. The legislation merely aims to secure a minimum of knowledge on the part of those who hold themselves out as competent to practice optometry. In the second place, an attempt of the legislature to suppress or minimize an evil is not to be held innocuous because it does not entirely eradicate it.

"It is established by repeated decisions that a statute aimed at what is deemed an evil is not to be upset by thinking up and enumerating other instances to which it might have been applied equally well, so far as the court can see." *Keokee C. C. Co. v. Taylor*, 234 U. S. 224, 34 Sup. Ct. 856.

"Legislatures have the constitutional power to make unwise classifications." *Heath & Milligan M. Co. v. Worst*, 207 U. S. 338 (28 Sup. Ct. 114), at p. 357.

"In a classification for governmental purposes there cannot be an exact exclusion or inclusion of persons and things." *Ozan L. Co. v. Union Co. Nat. Bank,* 207 U. S. 251 (28 Sup. Ct. 89), at p. 256.

"It is no sufficient argument against this or any classification that it either may or does exclude individuals as well or better qualified than some which it includes." *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561.

"Nor is classification to be condemned by the courts because the situation of certain individuals in one class may not differ materially from the situation of certain individuals in another class. Such is frequently the case. It is the class, considered broadly as a class, which must possess the distinguishing differences of situation calling for different legislation, not every individual in the class." *Kiley v. C., M. & St. P. R. Co.* 142 Wis. 154, 159, 125 N. W. 464.

These, among other authorities which might be cited almost indefinitely, thoroughly establish the proposition that as to matters of classification the legislature has a very broad discretion, and that its judgment with reference thereto will be respected and enforced by the courts unless the classification is so arbitrary that there is no conceivable basis in reason therefor.

The foregoing also disposes of the objection that the law is void because physicians and surgeons, and persons who sell spectacles without attempting to test the eyes, are exempted from the provisions of the law. The propriety of the exemptions is so manifest that discussion of the reasons therefor would be but to attempt to demonstrate the obvious.

Sub. 6, sec. 1435*f*—35, Stats., provides that

"Any person who has been admitted to practice optometry in any other state may be permitted to practice optometry in this state, in the discretion of the board, upon payment of a registration fee of ten dollars and production of a certificate showing that he has passed an examination in such other state, and has actually practiced optometry therein for a term of two years."

Appellant claims that this amounts to a discrimination against residents of this state because the act favors non-

residents. We do not think so. The legislature simply demands of every person engaged in the practice of optometry in this state certain qualifications. It has declared how such qualifications may be ascertained. As to those who reside within this state, and all others for that matter, they may be ascertained by the examination provided for in the law. This, however, is not the exclusive way. The legislature has seen fit to declare that a certificate of examination from another state may be taken as evidence in this state that the person presenting such certificate does have the qualifications required. This is not unusual. For instance, the statutes of this state prescribe three distinct methods by which the qualifications of persons to practice law may be demonstrated. One is an examination by the state board of bar examiners. Another, a diploma of the law department of the University of Wisconsin. A third, a certificate of admission to practice in the court of last resort of another state, together with proof that the applicant has been engaged in the actual practice in such state for five years within the last eight years prior to filing his application. It has never been suggested that this amounts to a discrimination by or against any one. Manifestly it amounts to but three different ways by which the qualifications of those desiring to enter upon the practice of law may be ascertained. Similarly the law in question provides two ways in which that fact may be demonstrated. We see no reason why the legislature may not make a certificate showing that the applicant has passed an examination in another state proof of the fact that he possesses the qualifications requisite under the law of this state.

The next question is whether the evidence shows a violation of the law. The law defined the practice of optometry as "The employment of any means, other than the use of drugs, for the measurement of the powers of vision and the adaption of lenses for the aid thereof." Sub. 1, sec. 1435f—35, Stats. 1917. Did appellant employ any means

other than the use of drugs for the measurement of the powers of vision and the adaption of lenses for the aid thereof? We are satisfied that this should be answered in the affirmative. This was not a case where a customer simply picked out her own glasses by trying on pair after pair until she found a pair which satisfied her. She first went to his office, but, because he was not there, she was unable to procure her glasses. It appears, however, that his wife was there, and had it not been her purpose to have her eyes tested she might as well have picked out a pair of glasses without his presence. She did not do so, but left word that he should go to her home. He did so. "He put a big frame on my face and tested my eyes." "He gave one of my girls a card and they had to stand far away." "He asked me if I could see, and every time he would put a different glass on. He asked me to read as far as I could, until finally he found that my eyes was good, and then he gave me a pair of even glasses." The "big frame" testified to suggests the try-frame, which is one of the instruments used by optometrists for the measurement of the powers of vision. When we consider that the appellant is here insisting that he has a right to practice optometry and that the law which prohibits him from doing so is void; that he has taken three unsuccessful examinations for the purpose of securing a license therefor, coupled with the evidence above referred to, the inference that he used the big frame and the test card "for the measurement of the powers of vision and the adaption of lenses for the aid thereof" is justifiable.

Appellant raises a question concerning the construction of the statute which should be mentioned. Sub. 17 of the act (sec. 1435f—35, Stats. 1917) provides, in effect, that every person who shall practice optometry after the 1st day of January, 1916, without having obtained a certificate of examination and of registration, or who, not having obtained such certificate, *shall hold himself out to the public as qualified to engage in the practice of optometry* as defined in

this section, shall be guilty of a misdemeanor, etc. Sub. 19 provides that "Nothing in this section shall be construed to apply to physicians and surgeons authorized to practice under the laws of this state, nor to persons who shall sell spectacles from an established place of business without attempting to test the eyes." It is argued that one who sells spectacles without attempting to test the eyes is exempt from the provisions of the law, therefore a person who sells spectacles in that way may hold himself out to the public as qualified to engage in the practice of optometry and the public may be misled in the belief that they were purchasing spectacles from a skilled and qualified optometrist. It is quite apparent that the legislature did not intend any such result. It was the purpose of the legislature to prevent any one from holding himself out to the public as qualified to engage in the practice of optometry. It was also quite plainly the intent of the legislature to permit persons to sell spectacles so long as they did so without attempting to test the eyes. To permit one who sells spectacles, without attempting to test the eyes, to hold himself out to the public as qualified to engage in the practice of optometry, would of course be absurd, and statutes are not to be so construed as to result in an absurdity. *State ex rel. Husting v. Board of State Conv.* 159 Wis. 216 (150 N. W. 542), at p. 227.

In the construction of statutes we should "look to the whole and every part of the law, to the intent apparent from the whole, to the subject matter, to the effect and consequences, to the reason and spirit, and thereby ascertain the ruling idea present in the legislative mind at the time of its enactment, and then, if the manifest purpose of the lawmakers can thereby be reasonably spelled out of the words they used to express it, to give effect to such purpose, though the meaning thus adopted be quite contrary to the literal sense of the words." *Wis. Ind. School v. Clark Co.* 103 Wis. 651 (79 N. W. 422), at p. 659; *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 128 N. W. 1041. The intent of the legislature in passing this law is not difficult of ascertain-

ment. It was intended to prevent any one from practicing optometry, or from holding himself out as competent to practice optometry, until a license to do so had been secured as provided in the act. It was also intended to exempt from the provisions of the law persons who simply sold spectacles over the counter, where the customer makes his own selection and there is no attempt on the part of the salesman to test the eyes. We so construe the statute.

It follows from what has been said that we discover nothing invalid about the law, and that the proof shows that the appellant violated it. It follows that the judgment should be affirmed.

*By the Court.*—Judgment affirmed.