ASSOCIATED HOSPITAL SERVICE, INC., Appellant, v. CITY OF MILWAUKEE, Respondent.*

*April 3—May 2, 1961.*

* Motion for rehearing denied, with $25 costs, on June 27, 1961.

450

For the appellant there were briefs by *Foley, Capwell, Duersten & Foley* of Racine, attorneys, and *Walter H. Bender* of Milwaukee of counsel, and oral argument by *Mr. Jerome J. Foley, Mr. Rex Capwell,* and *Mr. Bender.*

For the respondent there were briefs by *John J. Fleming,* city attorney, and *Ewald L. Moerke, Jr.,* and *Harvey G. Odenbrett,* assistant city attorneys, and oral argument by *Mr. Moerke* and *Mr. Odenbrett.*

CURRIE, J.   We deem that the issues presented by this appeal are:

(1) Does sec. 182.032 (8), Stats., exempt from taxation by the city the real and personal property of a hospital-service corporation operating on the Blue Cross plan which has been organized under sec. 182.032 (2) (a), Stats. 1955 and 1957?

(2) If the preceding question is answered in the affirmative, does the plaintiff corporation qualify for such exemption?

(3) May the city, as a creature of the legislature, properly raise the issue of the constitutionality of sec. 182.032 (8), Stats. 1955 and 1957?

(4) If the city may properly raise the issue of constitutionality, does the exemption granted by such sec. 182.032 (8), Stats. 1955 and 1957, result in an unreasonable classification which violates the uniformity-of-taxation provision of the Wisconsin constitution or the equal-protection-of-the-laws clause of the Fourteenth amendment?

(5) Should a trial be had in order to bring additional facts before the circuit court on the issue of constitutionality?

In order to view these issues in their proper perspective, we consider it to be desirable that we review the history of the Blue Cross hospital-service movement and its objectives and method of operation, and also the history of the enactment of sec. 182.032, Stats. 1955 and 1957, and of the incorporation of the plaintiff.

As a source of much of such background information we have drawn upon facts set forth in a special report by the Wisconsin insurance department entitled, "Blue Cross and Blue Shield in Wisconsin" issued in January, 1959; an article entitled, "Enabling Legislation for Nonprofit Hospital Service Plans" by C. Rufus Rorem, 6 Law and Contemporary Problems (1939), 528, which is referred to in such special report; and the transcript of testimony given by directors and representatives of the plaintiff corporation before the insurance and banking committee of the Wisconsin assembly on April 1, 1959. Copies of such special report and transcript of testimony are on file in the legislative reference library. For the convenience of this court in taking judicial notice thereof, counsel for the plaintiff have filed certified copies of such report and transcript of testimony with this court.

Counsel for the city objects to this court's taking judicial notice of such insurance-department report and transcript of testimony before the assembly committee. However, counsel raise no question but that such certified copies are true copies of the original materials on file in the legislative reference library under the heading "Group Hospitalization." We are of the opinion that it is proper for us to take judicial notice of facts stated in such materials, and also of those set forth in the aforesaid article in 6 Law and Contemporary Problems, in passing upon the construction

to be placed on the exemption statute, sec. 182.032 (8), Stats. 1955 and 1957, and upon the constitutional issue raised with respect to unreasonable classification.[1] However, we deem it would be improper for us to take judicial notice thereof in passing on the contested issue of fact of whether the plaintiff corporation meets the requirement of sec. 182.032 so as to be entitled to any exemption extended by such statute. With respect to such latter adjudicative issue, we confine ourselves to the facts stated in the affidavits filed in support of, and in opposition to, the motion for summary judgment.

The generally recognized beginning of the Blue Cross movement was the plan established by Baylor University Hospital in Dallas, Texas, in 1929. A hospital-service agreement was entered into between a group of schoolteachers and such hospital. Each teacher paid $6 annually to the hospital, which made the subscriber eligible for three weeks' hospitalization. The experiment was successful and similar one-hospital plans were initiated with reasonable success in New Orleans, Fort Worth, Memphis, and other cities. The resulting competition among hospitals and the desire of many subscribers to be able to choose among several hospitals at time of illness led to the establishment of free-choice hospital-service plans.

In order to put such a free-choice hospital-service plan into operation it was found desirable that there be enabling legislation. In the state of New York, civic leaders, hospital administrators and trustees, and physicians co-operated

---

[1] Authorities which support such taking of judicial notice of legislative, as distinguished from adjudicative, facts are *Ritholz v. Johnson* (1944), 244 Wis. 494, 502, 12 N. W. (2d) 738, 741; *Chastleton Corp. v. Sinclair* (1924), 264 U. S. 543, 548, 44 Sup. Ct. 405, 68 L. Ed. 841; McCormick, Judicial Notice, 5 Vanderbilt Law Review (1952), 296, 316.

in drafting and sponsoring such an enabling act which became a law in 1934.[2] Many other states soon enacted similar enabling acts between 1934 and 1939 including Wisconsin.[3]

The American Hospital Association was active in promoting such Blue Cross enabling acts. Its commission on hospital service and its council on hospital-service plans drafted a model enabling act for distribution in 1938 and this influenced the legislation which was adopted in a number of the states.[4] While the hospital-service corporations authorized by the Wisconsin statute, now sec. 182.032, function on the same basis as those authorized by the model enabling act, the Wisconsin statute, with certain exceptions, bears very little resemblance in wording to the model act. One of the exceptions in which there is striking similarity is the provision providing for tax-exempt status. Such provision in the model act, sec. XIV, provides:

"Every corporation subject to the provisions of this act is hereby declared to be *a charitable and benevolent institution,* and its funds, operations, and properties shall be exempt from taxation." (Italics supplied.)

The original New York enabling act also had declared that any hospital-service corporation incorporated pursuant thereto was declared "to be *a charitable and benevolent*

[2] N. Y. Laws 1934, ch. 595, adding Article 14, sec. 452–461, to the New York Insurance Law.

[3] Alabama, California, and Illinois in 1935; Mississippi in 1936; Georgia, Maryland, Massachusetts, and Pennsylvania in 1937; Kentucky and New Jersey in 1938; Connecticut, District of Columbia, Iowa, Maine, Michigan, New Hampshire, New Mexico, Ohio, Rhode Island, South Carolina, Texas, Vermont, and Wisconsin in 1939.

[4] A copy of such model enabling act is set forth as an appendix to Rorem, Enabling Legislation for Nonprofit Hospital Service Plans, 6 Law and Contemporary Problems (1939), 528, at pages 542 *et seq.*

*institution"* (ch. 595, Article 14, sec. 461, New York In-surance Law).[5]

The plaintiff corporation was incorporated in 1939 under the enabling act enacted by the Wisconsin legislature, ch. 118, Laws of 1939, now sec. 182.032, Stats. The articles of incorporation state that the plaintiff is a "nonprofit hospital-service membership corporation without capital stock," and, "No part of its net earnings shall inure to the benefit of any private shareholder or individual." Such articles further provide that in event of dissolution, after payment of debts and obligations, its remaining assets shall be disbursed pro rata to the "participating hospitals" with which it has service contracts according to a formula set forth.

Sub. (2) (d), sec. 182.032, Stats. 1955 and 1957, re-stricts the type of hospitals with which the plaintiff is per-mitted to enter into service contracts to two classes, viz., *"participating hospitals"* and *"service hospitals."* Such sec-tion provides as follows:

"Such hospitals shall be participating hospitals or service hospitals. The term *'participating hospital,'* as used in this section, is defined to mean a voluntary nonprofit hospital acceptable to the corporation, and accepted by action of its board of directors, which may contract with the corporation under the terms, conditions, provisions, and regulations as the board of directors may prescribe, qualifying it to desig-nate members of the corporation as hereinafter provided. The term *'service hospital,'* as used in this section is defined to mean a voluntary nonprofit hospital, or a hospital owned, operated, and maintained by the state and any political sub-division thereof, acceptable to the corporation and accepted by action of its board of directors, which may contract with

---

[5] Such sec. 461 reads as follows: "Every corporation subject to the provisions of this article is hereby declared to be a charitable and benevolent institution, and all of its funds shall be exempt from every state, county, district, municipal, and school tax other than taxes on real estate and office equipment."

it under the terms, conditions, provisions, and regulations that the board of directors may prescribe, but which will grant no right to such service hospital to designate members of the corporation as aforesaid. . . ." (Italics supplied.)

The articles of incorporation restrict the members of the corporation to persons designated by the participating hospitals. As previously noted, upon dissolution only the participating hospitals share in the distribution of assets. At the time of hearing of the motion for summary judgment the plaintiff had service contracts with 56 participating hospitals and 86 service hospitals. The present board of directors consists of 28 directors chosen by the members from their own membership. Of these 28, 14 represent participating hospitals, seven are physicians, and seven represent the public. Sub. (2) (a), sec. 182.032, Stats. 1955 and 1957, requires that all directors and officers of the plaintiff shall receive no salary, pecuniary profit, or compensation.

The growth of Blue Cross in Wisconsin is evidenced by the fact that although its hospital-service contracts covered but 26,248 participants in 1940, by 1957 there were 974,477 participants covered by such contracts.

Such hospital-service contracts are entered into both with groups and individuals. The subscribers for such service pay a fixed fee in instalments, usually monthly, to the plaintiff. The plaintiff in turn enters into contracts with its participating and service hospitals whereby these hospitals agree to provide hospital service directly to the subscribers, or their dependents, subject to the limitations and conditions of the contracts existing between the plaintiff and the subscribers.

The objectives of Blue Cross plans for providing hospital service, such as that under which the plaintiff operates, are well summarized in the Wisconsin insurance department's 1959 report as follows (pp. 10, 12) :

"These objectives—maximum coverage and protection for the public and adequate financing for the hospital—realized in the most-economical manner, are the goals of Blue Cross. We can elaborate by saying that Blue Cross is a program designed to satisfy the needs of the public, the hospitals, and the community as a whole through a partnership between hospitals and a nonprofit prepayment plan. The goals and objectives of this partnership are:

"1. To provide an 'instalment payment-in-advance' method for financing the care provided by the community's hospitals;

"2. To make hospital care needed by the public financially accessible to the largest number of people at the lowest possible cost;

"3. To help the community carry the social and economic burden which is created when people are unable to pay for necessary care rendered by the hospitals."

In the light of facts of the foregoing historical background of both the Blue Cross movement and of the plaintiff's participation therein we now turn to the legal issues confronting us on this appeal.

*Effect of Sec. 182.032 (8), Stats. 1955 and 1957.*

Subs. (2) (a) and (8) of sec. 182.032, Stats. 1957, provide as follows:

"(2) (a) Nonprofit corporations, that is corporations formed without capital stock, operated not for profit and exclusively for the purposes in this section set forth, and which declare no dividend, benefit, or pecuniary profit, to be paid to or received by any of their members, directors, or officers, may be organized, under this section for the purpose of establishing, maintaining, and operating service plans, whereby hospital services may be provided to persons or groups of persons, subscribers to such plans, and their respective dependents, by hospitals with which such corporations may make a contract therefor."

"(8) Such corporation shall be governed by ch. 181, and unless express reference is made in this section, or unless expressly designated therein, no other law shall apply to such corporation. Every such corporation is hereby declared to be a charitable and benevolent corporation, and its property, real, personal and mixed, its income, and property transferred to it, shall be exempt from taxation as provided in secs. 70.11, 71.01 (3), 72.04, and 72.75 to 72.81, and its employees shall be excluded from the provisions of ch. 108 as provided in sec. 108.02."

It is the position of the plaintiff that such sub. (8) expressly provides for the exemption of its property from the taxes sought to be imposed by the city. On the other hand, the city advances two reasons why this is not the case. First, it asserts that the plaintiff is not a charitable and benevolent corporation as a matter of fact, and, therefore, the legislature cannot by legislative fiat declare it to be such when it is not. Secondly, the city contends that, under the wording of such sub. (8), the test of whether there is to be an exemption of the plaintiff's property from real and personal-property taxes is that set forth in sec. 70.11, Stats., and the plaintiff does not meet such test.

In support of its first contention the city points out that the plaintiff engages in no charitable or benevolent activities under the definitions of "charitable" and "benevolent" set forth in such decisions of this court as *Riverview Hospital v. Tomahawk* (1943), 243 Wis. 581, 11 N. W. (2d) 188; *Prairie du Chien Sanitarium Co. v. Prairie du Chien* (1943), 242 Wis. 262, 7 N. W. (2d) 832, 144 A. L. R. 1480; and *M. E. Church Baraca Club v. Madison* (1918), 167 Wis. 207, 167 N. W. 258. It is asserted that the plaintiff gives nothing away, but charges for the hospital service provided its subscribers, and that the plaintiff's activities do not relieve the state, or its political subdivisions, from expense for hospital care.

These last-mentioned assertions by the city are not strictly true. The board of directors of the plaintiff consists of persons of great ability—hospital administrators, physicians, attorneys, labor leaders, business executives, and church officials. They donate the time which they devote to the operations and affairs of the plaintiff. There can be little doubt but that such donated time and effort result in better hospital service being rendered to the plaintiff's subscribers and their dependents, such as the insertion of more-advantageous provisions from time to time in the subscribers' contracts. Furthermore, before the advent of hospital-service prepayment plans, many people were unable to pay hospital bills who can now afford the modest monthly fees charged by the plaintiff. Nevertheless, the hospitals did not then turn such people from their doors but rendered service, and in many cases collected from local municipalities therefor on the basis that the patients were indigents. Without the coming and wide use of the plaintiff's Blue Cross coverage, the financial burden of the municipalities in providing hospital care for indigents would be greater than it is today.

Some courts have adopted broad definitions of "charitable" and "benevolent" institutions which do not embody the idea of giving away something free. For example, in *Rueda v. Union Pacific R. Co.* (1946), 180 Or. 133, 169, 175 Pac. (2d) 778, 793, the Oregon court held that the Union Pacific Railway's hospitals and medical department were charitable in nature and declared:

"The test which determines whether such an enterprise is charitable or otherwise is its purpose. If its purpose is to make profit, it is not a charitable enterprise. If it is to heal the sick and relieve the suffering, without hope or purpose of getting gain from its operation, it is charitable. Tried by this test, the hospitals and medical department of this company are a great public charity."

Furthermore, an Ohio court has expressly held that a non-profit hospital-service association operating on the Blue Cross plan "is in every sense of the term a charitable and benevolent institution." *Cleveland Hospital Service Asso. v. Ebright* (1942), 36 Ohio L. Abs. 600, 603, 45 N. E. (2d) 157, 160, affirmed in *Cleveland Hospital Service Asso. v. Ebright* (1943), 142 Ohio St. 51, 49 N. E. (2d) 929.

The legislature in enacting sec. 182.032, Stats., was well cognizant of how Blue Cross hospital-service corporations do fulfil a public purpose which the legislature might well declare to be charitable and benevolent. This is manifested by the following declaration of policy appearing in sub. (1) of such statute:

"As a guide to the interpretation and application of this section, the public policy of this state is declared to be: To ease the burden of payment for hospital services, particularly in the low-income groups, where with the advance of scientific methods the payment for adequate hospital services is a pressing problem with grave social ramifications, nonprofit hospital-service corporations, based on the tested experience in many parts of the United States, economically sound and socially beneficent, are needed. While in no way changing the present status of voluntary hospitals in the state, these corporations will enable a larger number to procure for themselves adequate hospital services and leave the use of the free and part-free services given by the hospitals to those whose economic status makes self-procurement of such services impossible. Without imposing the burden on the public treasury and free from any motive of profit, these corporations will contribute to the solution of a pressing social and economic problem in the state and merit the support of the citizens."

However, let us suppose that no basis existed under the definitions of "charitable" and "benevolent" set forth in the dictionaries or court decisions for the application of such

adjectives to hospital-service corporations. Would that present any legal barrier to our legislature's declaring such corporations to be "charitable and benevolent?" We think not. We know of no constitutional provisions which would be violated thereby, and none are pointed out by the city.

The few cases in which acts of a legislative body, that have declared some institution to be something that it is not under all prior concepts, have been held void are typified by *Frost v. Railroad Comm.* (1926), 271 U. S. 583, 46 Sup. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457, and *Michigan Public Utilities Comm. v. Duke* (1925), 266 U. S. 570, 45 Sup. Ct. 191, 69 L. Ed. 445, 36 A. L. R. 1105. In such two cases the attacked legislative acts had declared private carriers to be common carriers thereby rendering them subject to regulation as common carriers. It was the result of rendering such private carriers subject to regulation as common carriers that afforded the basis for declaring such acts void as violating the due-process clause of the Fourteenth amendment. In the instant case neither the plaintiff nor the city claim any denial of due process. The city does contend, that the result of the legislature's declaring nonprofit hospital-service corporations to be charitable and benevolent, is to violate the uniformity-of-taxation provision of the state constitution and the equal-protection-of-the-laws clause of the Fourteenth amendment. However, this argument goes to the reasonableness of the classification as it affects tax exemption, and not to the validity of the declared definition itself.

The legislature, if it had seen fit to do so, simply could have granted tax exemption to the property of nonprofit hospital-service corporations without labeling them as "charitable arid benevolent." *Lawrence University v. Outagamie County* (1912), 150 Wis. 244, 246, 136 N. W. 619, 2 A. L. R. 465. The validity of such exemption would then depend upon whether any reasonable basis existed for exempting the property of such corporations and not that of

some other corporations whose property is taxed. To argue, that the act of attaching the label of "charitable and benevolent" in itself renders the entire exemption statute void, apart from the issue of reasonable classification, seems to us to be but a confusion of the issue. We find no merit in such contention.

The city further contends that the employment of the words of sub. (8) of sec. 182.032, Stats. 1955 and 1957, "as provided in secs. 70.11, 71.01 (3), 72.04, and 72.75 to 72.81" must be interpreted as meaning that the tests of exemption, in so far as real and personal-property taxes are concerned, are those set forth in sec. 70.11. The learned trial court rejected such interpretation and so do we.

There would be no purpose for the legislature to declare that a nonprofit hospital-service corporation is a charitable and benevolent corporation and tax exempt in sub. (8) of sec. 182.032, Stats. 1955 and 1957, if it already qualifies for exemption under sec. 70.11. On the other hand, if such corporation did not qualify for exemption under sec. 70.11, it also would be a meaningless gesture to declare in such sub. (8) that it was a charitable and benevolent corporation and tax exempt, if the ultimate tests of exemption are those prescribed by sec. 70.11. In interpreting statutes they must be construed, if possible, so as to avoid inconsistency and conflict and to give effect to every part. *State v. Berres* (1955), 270 Wis. 103, 107, 70 N. W. (2d) 197. Furthermore, it should not be presumed that any part of a statute is superfluous. 50 Am. Jur., Statutes, p. 365, sec. 359.

We have already noted that the enactment of sec. 182.032, Stats., was part of a nationwide movement to enact enabling legislation so that Blue Cross plans of providing hospital service could be made available in the various states. Both the 1934 New York statute, and the model enabling act sponsored by the American Hospital Association, employed the device of declaring nonprofit hospital-service corporations

to be "charitable and benevolent" institutions as part of the statutory provision for tax exemption. In view of this background, we are of the opinion that the draftsmen of sub. (8) of sec. 182.032, Stats. 1955 and 1957, and the legislature, intended to confer tax exemption on such nonprofit hospital-service associations. The reference therein to secs. 70.11, 71.01 (3), 72.04, and 72.75 to 72.81 was merely for the purpose of indicating the types of taxes to which the exemption applied, *i.e.*, real and personal, income, inheritance, and gift taxes.

### *Qualification of the Plaintiff for Exemption.*

The answers by the city to the plaintiff's complaints deny that the plaintiff operated as a nonprofit corporation, and allege that its operations have exceeded the powers granted to it by the legislature and are *ultra vires.*

However, unsubstantial *ultra vires* acts which did not convert the plaintiff into a corporation operated for profit, or otherwise materially change the character of its operations from that of a hospital-service corporation, would not be sufficient to destroy the exemption conferred by sub. (8) of sec. 182.032, Stats. 1955 and 1957. The city's brief points to no *ultra vires* activities which are inconsistent with its character as a hospital-service corporation.

The various affidavits set forth the operations of the plaintiff in detail. It has been very difficult for this court to determine from the city's brief what facts are relied upon by the city to establish that the plaintiff has exceeded its powers under sec. 182.032, Stats., and has been guilty of *ultra vires* activities. Apparently the city is not here pressing such issue but rather is relying on alleged *ultra vires* activities to establish that the plaintiff is not in fact operating as a nonprofit corporation.

There apparently are but two of such questioned activities. The first involves the plaintiff's relations with Health Service, Inc. Among the investments, in which the surplus funds of the plaintiff are invested, is an investment in the capital stock of Health Service, Inc., which cost $10,000 and is now valued at $23,000. Certain contracts are also entered into between the plaintiff and it. The second alleged unlawful activity is that the plaintiff has recognized as a "participating hospital" one whose nonprofit status has been questioned and is now under investigation.

Under the provisions of sec. 181.05, Stats., the city clearly has no right to raise the issue of *ultra vires* activities in this litigation. Such statute limits the raising of such issue to three specified types of proceeding, and this is not one of them. In none of such three specified types of action would the city be a proper party to raise the *ultra vires* issue.

Nonprofit hospital-service corporations are defined in sub. (2)(a) of sec. 182.032, Stats., as "corporations formed without capital stock, operated not for profit and exclusively for the purposes in this section set forth, and which declare no dividend, benefit, or pecuniary profit, to be paid to or received by any of their members, directors, or officers." The affidavits disclose without dispute that the operations of the plaintiff corporation meet such test. The denials and allegations of the city's answers are insufficient to raise a jury issue in view of the undisputed facts of the affidavits. *Laughnan v. Griffiths* (1955), 271 Wis. 247, 251, 73 N. W. (2d) 587, and *Home Savings Bank v. Bentley* (1958), 5 Wis. (2d) 19, 23, 92 N. W. (2d) 377.

The city stresses a fact that the income of the plaintiff from the fees collected from its subscribers has exceeded the amounts that the plaintiff has disbursed to the participating and service hospitals for hospital service supplied to the subscribers and their dependents. Over the twenty-year

period of 1940–1959, inclusive, the claims paid by the plaintiff for hospital service have amounted to 91.1 per cent of the plaintiff's income.

The fact that plaintiff's income exceeds its disbursements does not necessarily destroy its nonprofit character. Whether dividends or other pecuniary benefits are contemplated to be paid to its members is generally the test to be applied to determine whether a given corporation is organized for profit. *Read v. Tidewater Coal Exchange* (1922), 13 Del. Ch. 195, 116 Atl. 898, 904. The later Delaware case of *Southerland v. Decimo Club* (1928), 16 Del. Ch. 183, 192, 142 Atl. 786, 790, states the test of whether the making of a profit prevents a corporation from being one "not for profit" as follows:

> "If the facts and circumstances show the business to be such in character and volume as to indicate that the engaging in business and the making of profits therefrom for the benefit of its members is the principal or one of the principal objects of the corporation, rather than a thing which is subordinate and merely incidental to the principal object of its existence, it is reasonable to conclude that the corporation cannot be called one which is organized 'not for profit.'"

In the instant case the articles forbid any payments being made to the members. Furthermore, the fact that there is some margin of income over outgo does not militate against the objectives for which the plaintiff was organized, but rather promotes such objectives. This is because a hospital-service corporation should build up reasonable reserves to guard against the contingency of future claims exceeding income. The previously mentioned 1959 special report of the Wisconsin insurance department states (p. 17):

> "While large reserves are not necessary because of the nature of the Blue Cross operation, sound business policy of any fiduciary dictates maintenance of some reserve."

If such reserves are not consumed in the payment of future claims, they will pass on dissolution of the plaintiff corporation to the nonprofit participating hospitals, not to the individual members of the corporation. We attach no significance to the fact that the nonprofit status of one of such participating hospitals is now in issue. This is because we must assume that, when dissolution occurs, the provisions of plaintiff's articles of incorporation for distribution of assets will be observed, and that such distribution will only be made to nonprofit participating hospitals.

The brief of the city also points out that in 1959 the plaintiff realized from investments the sum of $160,000 income; and that it also receives approximately $300,000 income from Blue Shield, for acting as enrolling and billing agent for such organization, which is a nonprofit plan for sickness care pursuant to sec. 148.03, Stats. Plaintiff's total net income for 1959 was $2,318,425. Sub. (7) of sec. 182.032, authorizes the plaintiff to invest its funds as provided in secs. 206.34 and 206.35, relating to investments of domestic life insurance companies. Likewise, sub. (2)(e) of sec. 182.032 expressly authorizes the plaintiff to act as enrolling and billing agent for Blue Shield. Therefore, the legislature contemplated that the nonprofit hospital-service corporations would have these additional sources of income when it granted tax exemption to them.

The city further points to some other minor and miscellaneous sources of income. We consider them to be too trivial in nature to warrant discussion. Sub. (2) (c) of sec. 182.032, Stats., authorizes the plaintiff's board of directors to "do all things necessary, proper, or incidental to the exercise of the powers granted" to a nonprofit hospital-service corporation by sec. 182.032. We are satisfied that all of such miscellaneous income is derived from activities which

the directors in good faith deemed necessary, proper, or incidental to carrying out of the general purposes of the plaintiff corporation.

We, therefore, determine that the plaintiff is in fact a nonprofit hospital-service corporation and qualifies for tax exemption under sub. (8) of sec. 182.032, Stats. 1955 and 1957.

*Right of the City to Raise the Issue of Constitutionality.*

The relationship of municipalities was thoroughly considered by this court in *Madison Metropolitan Sewerage Dist. v. Committee on Water Pollution* (1951), 260 Wis. 229, 50 N. W. (2d) 424. It was therein held that a municipality, being a creature of the legislature and an instrumentality of the state, had no standing to attack the constitutionality of a statute on the ground that such a statute worked a denial of due process to the municipality in violation of the Fourteenth amendment. On this point, see also *Douglas County v. Industrial Comm.* (1957), 275 Wis. 309, 81 N. W. (2d) 807. Likewise, a municipality cannot raise the issue that a statute denies to it the equal protection of the laws. 16A C. J. S., Constitutional Law, p. 331, sec. 508. The New Jersey court in *Clifton v. Passaic County Board of Taxation* (1958), 28 N. J. 411, 422, 147 Atl. (2d) 1, 7, has recently declared:

"Moreover, municipalities are political subdivisions of the state for the exercise of delegated governmental powers; and in the very nature of the relation the restraints of the Fourteenth amendment have no application."

However, in the instant appeal the city is not contending that there has been any denial to it of due process or equal protection of the laws by sec. 182.032 (8), Stats. Rather the

city stands here in a representative capacity and in behalf of its resident taxpayers, who might be adversely affected if such statute is made effective as to plaintiff's property, raises the constitutional objection that it does.

We were presented with a somewhat-similar situation in the recent case of *Fulton Foundation v. Department of Taxation,* ante, p. 1, 108 N. W. (2d) 312. There the instrumentality of the state and creature of the legislature, which raised the issue of the constitutionality of a statute exempting certain gifts to charitable organizations from gift tax, was the Wisconsin department of taxation. Our opinion therein pointed out that the department had no personal interest which was affected by the statute under attack. It further cited the general rule, that state agencies cannot question the constitutionality of a statute unless it is their duty to do so, or unless they will be personally affected if they fail to do so and the statute is held invalid. However, we further determined that an exception should be made to such rule in the situation where the constitutional issue presented is one of great public concern or interest.

In our original opinion in the *Fulton Foundation Case* we held that the question of whether a particular tax exemption granted by the legislature denied the equal protection of the laws was not one of great public concern. While not expressed in the opinion, the underlying reason for such holding was that such exemption was only of concern to other taxpayers of the same general class, and that they were the ones who should be required to litigate the constitutional issue and not the department. However, in our memorandum opinion on the motion for rehearing, ante, p. 14a, 109 N. W. (2d) 285, we have receded from our original holding and have now held that this particular constitutional issue was one of great public concern which the department should be permitted to raise.

Likewise, in the instant appeal, we hold that the issue, of whether the particular tax exemption now before us violates the uniformity-of-taxation provision of our state constitution and denies equal protection of the laws, is one of great public interest which the city should be permitted to raise.

### Reasonableness of Classification.

It is the position of the city that commercial insurance companies that issue policies, which indemnify the policyholders for expenses incurred for hospital care of themselves and their dependents, perform the same function as does the plaintiff. From this assumed premise the city argues that an arbitrary and unconstitutional classification is made by sub. (8) of sec. 182.032, Stats. 1955 and 1957, in granting exemption to the property of the plaintiff and not that of such commercial insurance companies.

In the case of *Price v. State* (1919), 168 Wis. 603, 613, 171 N. W. 77, this court, after citing and quoting from a number of earlier cases, said:

"These, among other authorities which might be cited almost indefinitely, thoroughly establish the proposition that as to matters of classification the legislature has a very broad discretion, and that its judgment with reference thereto will be respected and enforced by the courts *unless the classification is so arbitrary that there is no conceivable basis in reason therefor.*" (Emphasis supplied.)

Furthermore, a legislature has much-more leeway in granting exemptions in taxation statutes than it does in regulatory measures enacted under its police power without running athwart of the equal-protection-of-the-laws clause of the Fourteenth amendment. *Hillside Transit Co. v. Larson* (1954), 265 Wis. 568, 583, 62 N. W. (2d) 722.

Sec. 182.032, Stats., the enabling act under which the plaintiff was organized, and its contracts with its participat-

ing and service hospitals and also with its subscribers, make it clear that the plaintiff is but the arm of such hospitals for collecting prepayment for hospital services. These hospitals, including those operated by the state, or a political subdivision thereof, are all nonprofit hospitals enjoying tax exemption. If the legislature can confer tax exemption upon those of such hospitals, which are not operated by the state or a political subdivision thereof, we can perceive of no valid reason why it should not be permitted to do the same with the plaintiff which is but an instrumentality of such hospitals.

There is a marked difference in method of operation between a Blue Cross hospital-service corporation and a commercial insurance company that sells hospital-care indemnity insurance. We recently had occasion to point this out in *Kopp v. Home Mut. Ins. Co.* (1959), 6 Wis. (2d) 53, 57, 94 N. W. (2d) 224, wherein we stated:

"There are two widely used methods whereby a person can purchase protection against future hospitalization costs. One is to purchase an insurance policy providing for the reimbursement to the insured for future hospital costs falling within the limits of the policy. The other is to enroll under the Blue Cross plan whereby all affiliated hospitals agree to provide such person free hospital service falling within a certain specified scale of benefits."

Thus a Blue Cross hospital-service corporation, through its participating and service hospitals, provides hospital service directly to the subscriber, or his dependents, while the commercial insurance company provides money indemnity. There is nothing to prevent a policyholder from using the indemnity payment received by him for purposes other than paying his hospital bill. Thus, while the policyholder is protected, the hospital which provided the service is not. The state's interest in protecting the financial status of its state, county, municipal, and voluntary nonprofit hospitals is a further justification for treating Blue Cross hospital-service

corporations differently taxwise than it does commercial insurance companies writing hospital-care indemnity insurance.

There is a split of authority as to whether nonprofit medical and hospital-service corporations are engaged in the insurance business, a majority of the decisions holding that they are not. Anno. 167 A. L. R. 322. However, Ohio, which is one of the jurisdictions that holds that such corporations are engaged in the insurance business, nevertheless has upheld the constitutionality of a statute which exempted them from the payment of a general franchise tax imposed upon other insurance corporations. *Cleveland Hospital Service Asso. v. Ebright* (1943), 142 Ohio St. 51, 49 N. E. (2d) 929.

In *State ex rel. Bernhard Stern & Sons v. Bodden* (1917), 165 Wis. 75, 160 N. W. 1077, a statute granting exemption from tax was attacked on the ground of violating sec. 1, art. VIII, Const., requiring uniformity of taxation. This court found the classification reasonable and upheld the constitutionality of the tax. In its opinion the court cited with approval the following extract from an earlier opinion in *Black v. State* (1902), 113 Wis. 205, 219, 89 N. W. 522 (p. 81) :

" 'There may indeed be classification ; and if the classification be founded upon real differences, affording rational grounds for a distinction, such classification will not violate the rule of uniformity and equality.' "

Enough has been said to indicate that the classification made by sub. (8) of sec. 182.032, Stats. 1955 and 1957, does rest upon real differences existing between nonprofit hospital-service corporations and commercial insurance companies writing hospital-care indemnity insurance. Therefore, such statute does not impose an arbitrary or unreasonable classification and is constitutional.

## Necessity of a Trial for Adducing Further Evidence on Issue of Constitutionality.

The learned trial court in its memorandum opinion cited *Ritholz v. Johnson* (1944), 244 Wis. 494, 12 N. W. (2d) 738, as authority for holding that evidence beyond the facts set forth in the affidavits should be required in passing upon the issue of constitutionality.

The opinion in the *Ritholz Case* held that a court has not only the right but the duty to inform itself in some appropriate way in regard to the facts involved where the constitutionality of a statute has been challenged. It pointed out that a court might do this by resort to encyclopedias, authoritative works on the subject, reports of committees or scientific bodies, and any other source of information that is generally considered accurate and reliable, or it may resort to a judicial investigation of such facts. The court in that case determined that a judicial investigation to ascertain the facts surrounding the practice of optometry was preferable to that of proceeding by judicial notice. This was because the court stated it had no satisfactory method of informing itself as to such facts except by having evidence produced at trial and the trial court making findings of fact thereon. However, the court also took pains to point out that neither the trial court, nor it, would be bound by such findings in resolving the issue of constitutionality.

Whether or not this court, when confronted with an issue of the constitutionality of a statute, will require a judicial investigation through trial of facts, or whether it will inform itself through independent research and the taking of judicial notice, is something that lies entirely within the court's sound discretion. In the recent case of *White House Milk Co. v. Reynolds* (1960), 12 Wis. (2d) 143, 106 N. W. (2d) 441,

this court also exercised its discretion to have a judicial determination of facts made in a case presenting an issue of constitutionality of legislation. In the instant case we can see no necessity of having further evidence adduced at the trial court level.

This court held in *State ex rel. Carnation Milk Products Co. v. Emery* (1922), 178 Wis. 147, 160, 189 N. W. 564, that if there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such facts in mind and passed the act pursuant thereto. Because the facts now before us afford a reasonable basis for the classification made by the legislature in exempting the plaintiff's property from taxation, the assembling of further facts by way of trial could serve no useful purpose.

We hesitate to lay down any rule governing the exercise of discretion by trial courts, when confronted with an issue of constitutionality of a statute on demurrer or motion for summary judgment, in determining whether to direct that a judicial inquiry into the facts bearing on constitutionality be had by trial. In considering such a problem a trial court must keep in mind that it is better practice for it to assume the statute is constitutional until the appellate court has passed upon it except where unconstitutionality is apparent beyond a reasonable doubt. *State v. Stehlek* (1953), 262 Wis. 642, 645, 56 N. W. (2d) 514.

*By the Court.*—The order denying summary judgment is reversed, with directions to enter judgment as prayed for in plaintiff's three complaints. In taxing costs the plaintiff may include costs for printing its entire brief although the same exceeds 50 pages.