**COMMUNITY BLOOD BANK OF the KANSAS CITY AREA, INC., a Corporation, et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 18645.

United States Court of Appeals
Eighth Circuit.

Jan. 10, 1969.

Lucian Lane, of Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, Mo., for Community Blood Bank, etc.

Dick H. Woods, of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for Kansas City Area Hospital Assn. and petitioners other than Community Blood Bank.

Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C., for respondent, James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, F.T.C., on the brief.

Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., and Lewis, Roca, Beauchamp & Linton, Phoenix, Ariz., on brief of amicus curiae, Community Blood Bank Council.

Evans & Dixon, St. Louis, Mo., and Peart, Hassard, Smith & Bonnington, San Francisco, Cal., on brief of amicus curiae, American Assn. of Blood Banks.

Before MATTHES, MEHAFFY and HEANEY, Circuit Judges.

MATTHES, Circuit Judge.

This case is before us on a petition to review and set aside a final decision and order of the Federal Trade Commission entered on September 28, 1966,[1] directing petitioners to cease and desist from unfair methods of competition and unfair acts and practices alleged to be in violation of § 5(a) of the Federal Trade Commission Act (15 U.S.C. § 45(a)).[2] Jurisdiction is conferred upon this Court by § 5(c) of the Act.

The petitioners to which the order is directed are divided generally into three groups: (1) Community Blood Bank of the Kansas City Area, Inc., (Community), a Missouri not-for-profit corporation[3] and its officers, directors and agents; (2) Kansas City Area Hospital Association (AHA), a Missouri nonprofit corporation, and its officers, directors and agents and certain member hospitals. AHA is composed of hospital administrators and most of the Kansas City area hospitals, and serves its dues-paying members by collecting information and providing a forum for discussion of hospital problems and their solutions; (3) Individual pathologists affiliated with various hospitals located in the Kansas City area.

The Commission's complaint, filed on July 5, 1962, charged that petitioners entered into and carried out an agreement, understanding, combination or planned course of action to hinder the development of two commercial blood banks, Midwest Blood Bank and Plasma Center, Inc. (Midwest) and World Blood Bank (World). Petitioners were charged with carrying out the alleged planned course of action by: (1) not accepting or permitting the use of blood from Midwest or World in Kansas City area hospitals; (2) advising customers and prospective customers of Midwest and World that blood obtained from those firms would not be accepted in exchange for blood obtained from the hospitals or

1. The opinion and order are reported at Trade Reg.Rep. (1965-67 Complaints & Orders) ¶17,728.
2. Section 5 of the Act declares that "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce," are unlawful, and the Commission, by § 5(a) (6), is empowered to prevent corporations from engaging in these unlawful activities. Section 5(b) authorizes the Commission to issue a complaint against a corporation when it has reason to believe that corporation is committing the prohibited acts in commerce and if it finds that it would be in the public interest to do so. Section 5 of the Act is supplementary to the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (1963). Federal Trade Commission v. Motion Picture Advertising Service Co., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953); Federal Trade Commission v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931).
3. Hereinafter, "not-for-profit" corporations will be referred to as "nonprofit" corporations.

from Community; (3) advising the district blood clearing house[4] and the American Association of Blood Banks[5] that the hospitals in the Kansas City area would not accept blood from the two commercial banks. The complaint further charged such acts and practices injured the public, unreasonably restricted and restrained interstate commerce and competition in the exchange, sale and distribution of whole blood[6] and violated the intent of § 5 of the Act.

In their answer petitioners challenged the jurisdiction of the Commission and specifically denied all charges contained in the complaint.

A lengthy and exhaustive hearing before an examiner was concluded on September 24, 1963. The examiner, in his decision filed on June 8, 1964, found that petitioners were motivated by their feeling that commercial trafficking in blood was immoral and not in the public interest and that the "preponderance of creditable evidence establishes the existence of a scheme or plan knowingly entered into by [petitioners] each of whom knew it would, if entered into by others, restrain the trade of Midwest."

The examiner recommended that petitioners be ordered to cease and desist from engaging in the acts and practices complained of. Petitioners appealed to the Commission, which subsequently upheld the examiner's findings and ordered petitioners to refrain from the proscribed conduct. Two of the five Commissioners dissented.

At issue here are a number of questions, first and foremost of which is whether the Commission was clothed with jurisdiction over the petitioners.[7]

4. Blood bank clearing houses are patterned after the monetary clearing houses. Their purpose is to facilitate the transfer of blood and credits among member banks located in different cities. Member banks requiring blood order it through the clearing house and those forwarding credits to other banks do so in the same manner. Blood banks are never indebted to each other, but instead are indebted to the clearing house. At the end of each month, the clearing house determines each bank's balance and requires settlement, either in the form of a fee or a shipment of whole blood or a combination of the two. Member banks do not ship directly to each other unless specifically directed to do so by the clearing house. Community, Midwest and World blood banks are all members of the clearing house system.

There is undisputed evidence showing that Midwest and World consistently refused to channel their credits and debits through the clearing house, but instead, contrary to the directions of the clearing house, attempted to deal directly with other member blood banks and hospitals. Community and AHA, as a defense to the charge that they boycotted Midwest and World, stated that they did not accept Midwest and World blood because the commercial banks failed to comply with clearing house procedures. The trial examiner, however, rejected this defense since several of the hospitals had refused to accept blood from Midwest before it became a member of the clearing house program and since the evidence was conflicting as to the actual obligation of a member bank to transfer blood through the clearing house system when the transfer was being made to a bank in close proximity to it.

5. The American Association of Blood Banks (AABB) is a national organization of blood banks formed in 1947. The examiner found AABB provides technical information on blood banking, encourages research, conducts an inspection and accreditation program for blood banks, sponsors reference laboratories to provide local blood banks with assistance on serological problems, and conducts the national clearing house program. Community is a member; Midwest and World are not. Membership in AABB is not a prerequisite for membership in its clearing house program.

6. Petitioners tacitly concede that their activities affected interstate commerce and therefore that requisite of the Commission's jurisdiction is satisfied.

7. Petitioners also challenge the jurisdiction of the Commission over the subject matter on the ground that human, whole blood, being by its nature living human tissue, is not a commodity or an article in commerce within the meaning of § 5 of the Act and because the entire process of hemotherapy from the selection and bleeding of the donor to infusion of the blood into the patient constitutes a medical service. Petitioners also contend that the evidence failed to establish any agreement,

We approach the jurisdictional issue mindful of certain general legal principles.

■ First, the Commission has only such jurisdiction as Congress has conferred upon it by the Federal Trade Commission Act. Federal Trade Commission v. Western Meat Co., 272 U.S. 554, 559, 47 S.Ct. 175, 71 L.Ed. 405 (1926); Federal Trade Commission v. Sinclair Refining Co., 261 U.S. 463, 475, 43 S.Ct. 450, 67 L.Ed. 746 (1922).

■ Second, if the jurisdiction of the Commission is challenged, it bears the burden of establishing its jurisdiction. Cf. Thomson v. Gaskill, 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942); McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 80 L.Ed. 1135 (1936); Hedberg v. State Farm Mut. Auto Ins. Co., 350 F.2d 924 (8th Cir. 1965).

■ Third, the general rule of statutory construction requires the courts to ascertain the intent of legislation from the language used. The legislative will must be ascertained from the statute if it is clear and plain and the whole act is internally cohesive. In 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951), the Court was prompted to state:

"But our problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain— neither to add nor to subtract, neither to delete nor to distort."

■ Fourth, the plain, obvious and rational meaning of a statute is to be preferred to "any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." Lynch v. Alworth-Stephens Co., 294 F. 190, 194 (8th Cir. 1923), aff'd. 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660 (1925).

■ Fifth, common words are to be taken in their ordinary significance in the absence of an indication of a contrary intent. Westerlund v. Black Bear Mining Co., 203 F. 599 (8th Cir. 1913).

■ The core of the jurisdictional dispute is whether the term "corporation" as defined in § 4 of the Act embraces any and all nonprofit corporations regardless of their objectives, motives and the results of their operations. This section, as originally enacted, defined "corporation" to mean "any company or association incorporated or unincorporated, which is organized *to carry on business for profit* and has shares of capital or capital stock, and any company or association, incorporated or unincorporated, without shares of capital or capital stock, except partnerships, which is organized *to carry on business for its own profit or that of its members.*" (Emphasis added.) The Wheeler-Lea Act of 1938 amended § 4 to read as follows:

"'Corporation' shall be deemed to include any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, which is organized *to carry on business for its own profit or that of its members,* and has shares of capital or capital stock or certificates of interest, and any company, trust, so-called Massachusetts trust, or association, incorporated or unincorporated, without shares of capital or capital stock or certificates of interest, except partnerships, which is organized *to carry on business for*

understanding or common course of action among petitioners to unreasonably restrict or restrain interstate commerce in human, whole blood, that the proceeding was not and is not in the public interest and that petitioners have been denied procedural due process.

Amici American Association of Blood Banks and Community Blood Bank Council of the Kansas City Area, Inc., generally support the petitioners' claim of no jurisdiction.

*its own profit or that of its members."* (Emphasis added.)[8]

Obviously, as recognized by the Commission, the troublesome phrase is "organized to carry on business for its own profit or that of its members." The Commission concluded that the word "profit" should be given one meaning as applied to corporations having shares of capital stock and another meaning as applied to those without shares. As to the former the Commission properly reasoned that they are so organized that profits may be distributed to their shareholders; the essence of their being is that their shareholders own an equity in the corporation and its income and are entitled not only to share in the profits but in the assets upon dissolution. "Thus," the Commission opined, "the phrase, 'carry on business for profit,' when applied to such corporations, should receive its traditional and most generally accepted definition—that the corporation is engaged in some undertaking for the purpose of realizing gain which will ultimately be distributed to the shareholders or members."

As to corporations without capital stock the Commission rationalized that the language "carry on business for its own profit or that of its members" *must* have a different meaning from the traditional phrase "organized to carry on business for profit" which is applied to corporations having shares of capital.

The Commission reasoned that since a corporation not having capital stock does not distribute amounts realized to incorporators, officers, directors, or other persons the words "business" and "profit" must have a broader connotation than those usually ascribed to these words, stating: "The only logical meaning which the phrase 'organized to carry on business for its own profit * * *' could have when applied to a corporation

unable to distribute 'profits' realized is that the corporation is organized to engage in some undertaking for which it will receive compensation in the form of fees, prices, or dues and is not prohibited by its charter from devoting any excess of income over expenditures or other benefit derived from doing business to its own use; i. e., *for its own self-perpetuation or expansion."* (Emphasis added.)

The interpretation of the Commission means, of course, that any corporation engaged in business only for charitable purposes and which is forbidden by law to carry on business for profit, that receives income in excess of expenses, is in fact carrying on business for its own profit if it is capable of self-perpetuation or expansion.

■■ Neither the legislative history of the Act nor the language of § 4 supports the Commission's theory that Congress intended that "profit" is to be given different meanings depending upon the character of the corporation under consideration. Additionally, the strained interpretation of the Commission runs counter to the principle "that Congress will be presumed to have used a word in its usual and well-settled sense." United States v. Stewart, 311 U.S. 60, 63, 61 S.Ct. 102, 105, 85 L.Ed. 40 (1940). See also National Labor Relations Board v. Coca-Cola Bottling Co., 350 U.S. 264, 268, 76 S.Ct. 383, 100 L.Ed. 285 (1956); Old Colony R. R. Co. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484 (1932).

■ The frequency of the use of the word "profit" in various facets of life accounts for the different definitions of the term.[9] Manifestly, its meaning must be derived from the context in which it is used.

---

8. One of the purposes of the Wheeler-Lea Act was to expand the definition of "corporation" by providing that it shall include any trust or "so-called Massachusetts trust." Amendments to Federal Trade Commission Act, S.R. No. 1705, 74th Cong., 2d Sess. (1936).

9. See Webster's Third New International Dictionary, Unabridged (1965) for different definitions.

■ According to a generally accepted definition "profit" means gain from business or investment over and above expenditures, or gain made on business or investment when both receipts or payments are taken into account.[10] Rubber Co. v. Goodyear, 9 Wall. 788, 76 U.S. 788, 804, 19 L.Ed. 566 (1869); Terre Haute Brewing Co. v. Dwyer, 116 F.2d 239, 242 (8th Cir. 1940); Fechteler v. Palm Bros. & Co., 133 F. 462, 469 (6th Cir. 1904); Maddox v. International Paper Co., 47 F.Supp. 829, 830 (D.La.1942). There is also authority for the proposition that even though a corporation's income exceeds its disbursements its nonprofit character is not necessarily destroyed. Associated Hospital Service, Inc. v. City of Milwaukee, 13 Wis.2d 447, 109 N.W.2d 271, 88 A.L.R.2d 1395 (1961). In that case a hospital service corporation operating under the Blue Cross Plan charged for its services, and its income actually exceeded the amounts disbursed to participating and service hospitals. The Supreme Court of Wisconsin held that the corporation still qualified as a nonprofit corporation. The court held that "[w]hether dividends or other pecuniary benefits are contemplated to be paid to its members is generally the test to be applied to determine whether a given corporation is organized for profit." The court further noted, quoting from Southernland v. Decimo Club, 16 Del.Ch. 183, 142 A. 786, 790 (1928), that engaging in business and making profits must be more than a subordinate or mere incidental characteristic of a corporation's existence for it to be considered one operated for profit.

■ In our view the test to be applied in determining whether a corporation without shares of stock is exempt is whether it engages in business for *profit* within the traditional and generally accepted meaning of that word.

■ A study of the legislative history of the original Act,[11] although not too illuminating, indicates that by limiting the corporations to be embraced within the provisions of the Act, Congress intended to exclude some corporations from the Commission's jurisdiction. Conversely, Congress did not intend to provide a blanket exclusion of all nonprofit corporations, for it was also aware that corporations ostensibly organized not-for-profit, such as trade associations, were merely vehicles through which a pecuniary profit could be realized for themselves or their members. We find support for this conclusion in a communication dated August 8, 1914 and accompanying memoranda from Joseph E. Davies, Commissioner of the Bureau of Corporations (predecessor to the Federal Trade Commission) to Senator Newlands, Chairman of the Committee on Interstate Commerce, author of the Senate version of the Trade Commission Bill and one of the managers in the Senate.[12] Therein Mr. Davies pointed out that under the pending proposals the Commission's jurisdiction did not extend to associations of manufacturers or dealers (trade associations), many of which were organized not-for-profit. Mr. Davies stated further:

> "As to some of the things done by these associations, no question as to their propriety can be raised; on the other hand, these organizations in-

---

10. The Commission in its opinion also adopted this as the most generally accepted definition of profit when applied to corporations which had capital shares and which distributed pecuniary gains to their shareholders or members. However, the Commission formulated its own definition of "profit" when applied to corporations without shares of stock.

11. See H.R. No. 533, 63d Cong., 2d Sess. (1914); S.R. No. 597, 63d Cong., 2d Sess.

(1914); H.R. No. 1142, 63d Cong., 2d Sess. (1914).

12. Davies' letter and accompanying memoranda do not appear in the reports mentioned in footnote 11. We have acquired this information from an appendix to the Commission's brief. The accuracy of such information is not challenged by petitioners.

variably furnish the vehicle and the possible temptation to engage in practices that are improper. Many of these associations claim to be organized not for direct pecuniary profit for their members, but nevertheless do furnish convenient vehicles for common understandings looking to the limitation of output and the fixing of prices contrary to the law. The power of the commission ought certainly to be sufficiently broad to enable it to inquire into the transactions of such associations.

"This might be amended by striking out the words 'having shares of capital or capital stock, organized to carry on business for profit,' and inserting in lieu thereof 'whether having shares of capital stock or not.' "

Consideration of relevant sections of related antitrust legislation sheds additional light on the subject. Section 7 of the Sherman Act (1890) and § 12 of the Clayton Act (enacted by the same Congress that passed the FTC Act) encompass *all* corporations.[13] They not only make no distinction between business and nonprofit corporations as does the FTC Act, but they contain no language whatsoever that would limit jurisdiction to particular types of corporations.

We find, however, that in § 13c of the Robinson-Patman Act (enacted by the same Congress that passed the Wheeler-Lea Act) Congress expressly excluded nonprofit corporations when purchasing supplies for their own use.[14]

Thus, we have two antitrust acts which are all-embracing and one which in clear language exempts nonprofit corporations. Congress pursued a different course in dealing with the jurisdiction of the Federal Trade Commission. Here, Congress chose not to exclude or include by specific designation nonprofit corporations. Rather it cast § 4 in language that does limit the jurisdiction generally to corporations engaged in business for profit for themselves or their members.

These distinguishing treatments by Congress in defining jurisdiction over corporations in the different antitrust acts clearly indicate that Congress was fully aware of the distinction between business corporations on the one hand and true nonprofit charitable corporations on the other. Having such knowledge, Congress took pains in drafting § 4 to authorize the Commission to regulate so-called nonprofit corporations, associations and all other entities if they are in fact profit-making enterprises. But contrary to the position of the Commission, Congress did not intend to bring within the reach of the Commission any and all nonprofit corporations regardless of their purposes and activities. If such were the intent of Congress we believe it would have followed the pattern of the Sherman and Clayton Acts. The limiting language of § 4 indicates an intention that the question of the jurisdiction over the corporations or other associations involved should be determined on an ad hoc basis. This interpretation would authorize the Commission to proceed against any legal entity without shares of capital which *engages in business for profit* within the traditional meaning of that language.

In making this ad hoc determination, we do not mean to hold or even suggest that the charter of a corporation and its statutory source are

13.  Section 7 of the Sherman Act (15 U.S.C. § 7) and § 12 of the Clayton Act (15 U.S.C. § 12) provide:
    "The word "person', or 'persons', wherever used * * * [in these Acts] shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country."

14.  Section 13c of the Robinson-Patman Act (15 U.S.C. § 13c) provides:
    "Nothing in * * * [this Act] shall apply to purchases of their supplies for their own use by schools, colleges, universities, public libraries, churches, hos-

alone controlling.[15] Indeed, the corporate petitioners, with candor, recognize that the mere *form* of incorporation does not put them outside the jurisdiction of the Commission. Their position, with which we agree, is that the reality of their being in law and in fact charitable organizations places them beyond the reach of the Act.

■ That the Commission does have jurisdiction over organizations without shares of capital or certificates engaged in business for a pecuniary profit is settled law. See and compare Federal Trade Comm. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); Fashion Originators' Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Millinery Creators Guild, Inc. v. Federal Trade Commission, 312 U.S. 469, 61 S.Ct. 708, 85 L.Ed. 955 (1941); Pacific States Paper Trade Ass'n v. Federal Trade Commission, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534 (1927); California Lumbermen's Council v. Federal Trade Commission, 115 F.2d 178 (9th Cir. 1940), cert. denied, 312 U.S. 709, 61 S.Ct. 827, 85 L.Ed. 1141 (1941); Chamber of Commerce of Minneapolis v. Federal Trade Commission, 13 F.2d 673 (8th Cir. 1926). It is evident, however, that the organizations in the above cases were designed to and did in fact bring together firms having common business concerns and such organizations or their members derived a profit over and above the ability to perpetuate or maintain their existence. The distinction between such an entity and a nonprofit charitable organization is cogently stated by Commissioner Elman in his dissenting opinion:

"But it is one thing for the Commission, in order to prevent frustration of the objectives of the Federal Trade Commission Act by transparent evasive devices, to hold liable a nonprofit corporation found to be the tool of corporations organized for profit which these corporations manipulate for evil ends, and quite another to read Section 4 out of the Act altogether and hold, as the Commission does today, that its jurisdiction under the Act embraces *all* corporations, profit and nonprofit alike, whatever the circumstances. Such is clearly the import of the Commission's holding. It is conceded that the corporate respondents are corporations validly organized and existing under nonprofit-corporation statutes; that they have been granted tax exempt status by the Internal Revenue Service; and that they do not distribute any part of their funds to, and are not organized for the profit of, members or shareholders. Any profit realized in their operations is devoted exclusively to the charitable purposes of the corporation. They have a paid staff, of course, but none of the officers or directors is paid. There is no contention that any of the corporate respondents is a device or instrumentality of individuals or firms who seek monetary gain through the nonprofit corporation. The majority opinion points out that Community Blood Bank conducts its affairs in a businesslike fashion and makes profits on the sale of blood, but that is certainly of no relevance here. A religious association might sell cookies at a church bazaar, or receive income from securities it holds, but so long as its income is devoted exclusively to the purposes of the corporation, and

pitals, and charitable institutions not operated for profit."

15. There are instances where corporations organized under nonprofit laws have actually engaged in profit-making or other activities. When this occurs they may lose their charter through quo warranto proceedings. People ex rel. Hughes v. Universal Service Ass'n, 365 Ill. 542, 7

N.E.2d 310 (1937); National Bureau of Property Administration, Inc. v. Tax Service Ass'n, 290 Ill.App. 152, 8 N.E.2d 51 (1937); State ex inf. v. Kansas City College of Medicine and Surgery, 315 Mo. 101, 285 S.W. 980, 46 A.L.R. 1472 (1926); State v. Springfield African Social & Improvement Club, 169 Mo.App. 137, 154 S.W. 458 (1913).

not distributed to members or shareholders, it surely does not cease to be a nonprofit corporation merely because it has income, or keeps its books and records (as indeed the law might require it to) in much the same manner as commercial enterprises."

We now briefly review salient portions of the record which show that the corporate petitioners do not fall within the ambit of § 4.

The parties stipulated and the Commission found that all of the corporate petitioners are nonprofit corporations organized under the laws of Missouri and Kansas.[16] None has shares of capital or capital stock or certificates. Community's articles of incorporation provide: that its objectives and purposes are "charitable, educational, civic, patriotic, social welfare, health, scientific and research * * * To create, establish and maintain a permanent blood bank of human blood, to collect whole human blood from voluntary or paid donors * * *"; no part of Community's earnings shall inure to the benefit of any member or any other individual, or corporation; upon dissolution all assets not held on condition requiring return, transfer or conveyance, "shall be transferred * * * to one or more domestic or foreign corporations, trusts, societies or other organizations engaged in charitable, religious, eleemosynary, benevolent, educational, or engaged in non-profit activities * * *."[17] AHA's articles of incorporation also declare that it is organized exclusively for educational and charitable purposes. They, too, require the corporation's assets, upon dissolution, to be disposed of in accordance with the provisions of § 355.230 of the Missouri General Not For Profit Corporation Law.

Both Community and AHA are also exempt from federal income tax liability.

The uncontradicted evidence shows, and the Commission found, that no part of any funds received by Community and AHA have ever been distributed or inured to the benefit of any of their members, directors or officers; all receipts have been used exclusively for the purposes authorized by law and their articles of incorporation; all funds received by Community originated from gifts, loans and grants, replacement blood donations and payment of responsibility and processing fees; AHA received its funds from grants, loans, gifts and dues of member hospitals. Of added significance is the finding that the receipts by Community have not been sufficient to meet expenses and to repay outstanding loans.

The Commission also held that "acceptance of the assertion that the corporate respondents * * * are not embraced by the definition of 'corporation' would not prevent the Commission from adjudicating their participation in the alleged conspiracy. * * * Although conspiracies in restraint of trade are usually reached by proceedings against the individual conspirators, we think that the Commission may consider the alleged conspiracy in this case as a partnership and proceed against it pursuant to the statutory grant of authority over partnerships." We are not cited to any authority and have found none which supports this novel and ingenious theory. The Commission relies upon cases holding that a conspiracy is a continuing partnership for purposes of attributing the overt acts of one conspirator to another and for admitting into evidence the declaration of one conspirator against the others. This is settled law.

16. Forty-three hospitals, members of petitioner AHA, were organized either under not-for-profit laws of Missouri and Kansas, or were instrumentalities of the federal, state, county or local governments. All satisfied the requirements of the federal law entitling them to exemption from federal income tax liability. Two of the member hospitals were proprietary corporations.

17. This method of disposition of assets on dissolution follows that required by § 355.-230 of the Missouri General Not For Profit Corporation Law.

However, the cases cited by the Commission, United States v. Kissel, 218 U.S. 601, 608, 31 S.Ct. 124, 54 L.Ed. 1168 (1910); Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 62 L.Ed. 260 (1917); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Fiswik v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946), are factually distinguishable and lend little, if any, support to the Commission's position that the corporate petitioners may be treated as a partnership. *Kissel,* a criminal prosecution, involved a conspiracy proscribed by the Sherman Act. *Mitchell* was an action in equity to obtain an injunction. The court discussed the rule of evidence applicable where persons associate themselves together in the prosecution of a common plan or enterprise. *Socony-Vacuum Oil Co.* was also a criminal prosecution for violations of § 1 of the Sherman Act. *Fiswik* was a criminal case involving a conspiracy to defraud the United States by filing false registration statements under the Alien Registration Act of 1940.

The Commission advances still another hypothesis in an attempt to establish its jurisdiction over the corporate petitioners. Its position is pinpointed by this excerpt from its opinion:

"While we do not think that treating the conspiracy as a partnership bestows individual jurisdiction over the not-for-profit corporations if such jurisdiction is otherwise lacking, the order may be enforced indirectly against any of the not-for-profit corporations found to be participants in the conspiracy by enforcing it against those officers, directors, and employees found to be subject to the order in their individual capacities."

In regard to these individuals the Commission found:

"Most of these respondents were pathologists or administrators at hospitals which refused to accept blood from the commercial banks. Others were key employees or leaders of Community or the Hospital Association, and in their particular capacities were active in establishing the policies followed by these two corporations."

The Federal Trade Commission Act, § 5(a) (6), grants the Commission jurisdiction over all "persons." Unlike corporations, the Act does not exempt persons not acting for profit. But as Commissioner Elman pointed out in his dissenting opinion, "the distinction made in the Act between corporations acting for profit and nonprofit corporations would be erased if all the Commission had to do, in order to obtain jurisdiction, was to name the officers, directors and other personnel of a nonprofit corporation as the respondents."

The Commission rests its premise on Benrus Watch Co. v. Federal Trade Commission, 352 F.2d 313 (8th Cir. 1965), and Standard Distributors, Inc. v. Federal Trade Commission, 211 F.2d 7 (2d Cir. 1954). In the context of the facts presented in those cases the Commission was fully justified in enforcing its order against the offending agents and representatives of the corporations. We again detect distinguishing characteristics between those decisions and our case. Both *Benrus* and *Standard Distributors, Inc.* were business corporations. They were charged with violation of the Act as were certain of their agents and representatives. All parties were in business solely for the purpose of making money. Under these circumstances it is scarcely debatable that all participants were subject to the jurisdiction of the Commission.

Here, however, the individuals named in the order were acting entirely on behalf of the nonprofit corporate petitioners. They were "public-spirited volunteers" and derived no personal profit, benefit or advantages in their individual occupations as businessmen, lawyers, doctors, labor leaders or clergymen from their participation in the activities of the community-wide blood bank program.

Their activities at all times were directed toward promoting a community-sponsored program in the public interest and at no time were infected with commercial intent.

█ In this situation we hold that the Commission is not entitled to acquire jurisdiction otherwise lacking over the nonprofit corporations by indirection, that is, by enforcing its order against the pathologists, administrators or key employees of the corporations.

Having found that the Commission lacked jurisdiction over the petitioners named in its order, we refrain from deciding whether the Commission possessed jurisdiction over the subject matter. For the same reason we have not fully explored the merits of the controversy.

By way of summary, we hold:

█ 1. That under § 4 the Commission is vested with jurisdiction over nonprofit corporations without shares of capital, such as trade associations, which "carry on business for [their] own profit or that of [their] members," within the traditional and generally accepted definition of the quoted phrase.

█ 2. That under § 4 the Commission lacks jurisdiction over nonprofit corporations without shares of capital, which are organized for and actually engaged in business for only charitable purposes, and do not derive any "profit" for themselves or their members within the meaning of the word "profit" as attributed to corporations having shares of capital.

3. That the corporate petitioners are true nonprofit corporations, not engaged in business for profit for themselves or their members.

4. That the Commission lacks jurisdiction over all of the petitioners.

The order of the Commission is set aside and annulled.