**CALIFORNIA DENTAL ASSOCIATION,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 96–70409.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 16, 1997.

Decided Oct. 22, 1997.

Peter M. Sfikas, Bell, Boyd & Lloyd, Chicago, IL, for petitioner.

Ernest J. Isenstadt, Assistant General Counsel, Federal Trade Commission, Washington, DC, for respondent.

Before: CHOY and HALL, Circuit Judges, and REAL, District Judge.*

Opinion by Judge HALL; Dissent by Judge REAL.

CYNTHIA HOLCOMB HALL, Circuit Judge.

The California Dental Association ("CDA") petitions for review of an order of the Federal Trade Commission ("FTC") that it cease and desist from restricting certain types of advertising by its members. The issues are whether the FTC has jurisdiction over the CDA and whether substantial evidence supports its conclusion that the CDA's advertising policies, as applied, unreasonably restrain

---

* Hon. Manuel L. Real, United States District Judge for the Central District of California, sitting by designation.

trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 5 of the FTC Act, 15 U.S.C. § 45. We have jurisdiction pursuant to 15 U.S.C. § 45(c) and affirm.

## I. BACKGROUND

### A. The CDA

The CDA is a trade association for licensed dentists in the State of California. It is part of the American Dental Association ("ADA") and is itself composed of 32 local "component societies." Individual dentists must be a member of a local component to belong to the CDA, and must belong to the CDA to join the ADA. CDA membership is not a condition to obtaining a dentist's license from the state, but roughly 75 percent of the practicing licensed dentists in California belong to it. The CDA is organized as a nonprofit corporation under California law and federal tax law.

The CDA provides its members a variety of services, such as lobbying, marketing and public relations, seminars on practice management, assistance in compliance with OSHA and disability requirements, continuing education, placement services, and administrative procedures for handling patient complaints. It also has several for-profit subsidiaries from which members can obtain liability and other types of insurance, financing for equipment purchases, long-distance calling discounts, auto leasing, and home mortgages. CDA membership also allows access to a broad range of similar benefits from ADA membership.

### B. The CDA's Advertising Policy

As a condition of membership, dentists agree to follow the CDA Code of Ethics, which provides that dentists may be disciplined for unprofessional conduct and violations of state law relating to the practice of dentistry. This case concerns the Code's ethical standards concerning advertising. The basic rule is set out in section 10 of the Code, which states,

"Although any dentist may advertise, no dentist shall advertise or solicit patients in any form of communication in a manner that is false or misleading in any material respect. In order to properly serve the public, dentists should represent themselves in a manner that contributes to the esteem of the public. Dentists should not misrepresent their training and competence in any way that would be false or misleading in any material respect."

The CDA's Judicial Council, which is responsible for enforcing the Code, has released the following advisory opinions elaborating upon the ethical standard for advertising: [1]

2. A statement or claim is false or misleading in any material respect when it:

a. contains a misrepresentation of fact;

b. is likely to mislead or deceive because in context it makes only a partial disclosure of relevant facts;

c. is intended or is likely to create false or unjustified expectations of favorable results and/or costs;

d. relates to fees for specific types of services without fully and specifically disclosing all variables and other relevant factors;

e. contains other representations or implications that in reasonable probability will cause an ordinarily prudent person to misunderstand or be deceived.

3. Any communication or advertisement which refers to the cost of dental services shall be exact, without omissions, and shall make each service clearly identifiable, without the use of such phrases as "as low as," "and up," "lowest prices," or words or phrases of similar import.

4. Any advertisement which refers to the cost of dental services and uses words of comparison or relativity—for example, "low fees"—must be based on verifiable data substantiating the comparison or statement of relativity. The burden shall be on the dentist who advertises in such terms to establish the accuracy of the comparison or statement of relativity.

---

1. According to the Preamble to the Code, advisory opinions are not binding on members but "may be considered as persuasive by the trial body and any disciplinary proceedings under the CDA Bylaws."

8. Advertising claims as to the quality of services are not susceptible to measurement or verification; accordingly, such claims are likely to be false or misleading in any material respect.

The advisory opinions substantially mirror parts of the California Business and Professions Code. *See* Cal. Bus. & Prof.Code §§ 651, 1680. The CDA claims that its Code, as explained by the advisory opinions, is intended to ensure that dentists comply with these laws.

The CDA has also issued an additional set of advertising guidelines intended to help members comply with the Code of Ethics and state law. According to the section on discount advertising, state law requires dentists offering discounts to list all of the following in the advertisement:

1. The dollar amount of the nondiscounted fee for the service;

2. Either the dollar amount of the discount fee or the percentage of the discount for the specific service;

3. The length of time that the discount will be offered;

4. Verifiable fees; and

5. Specific groups who qualify for the discount or any other terms and conditions or restrictions for qualifying for the discount.

According to the testimony of current and former CDA officials, the state Board of Dental Examiners generally does not pursue violations of state laws on advertising by dentists, and CDA has attempted to fill in the gap with its own enforcement efforts.

Both the CDA and its component societies enforce the CDA's advertising rules. Typically, components undertake the initial investigation into a member's advertising and, if possible, resolve the matter at the local level without CDA's involvement. Thus, if a component ethics committee concludes that a member's advertising is false or misleading in violation of the Code, it asks the member to discontinue or modify the advertisement. If the member does not agree or the component is unsure of how to apply the relevant standard under the Code, the case is referred to the CDA Judicial Council, which holds a hearing. If it finds a violation, and no settlement can be reached, the CDA can impose a range of penalties including censure, suspension and expulsion.

The CDA and its components also review the advertisements of applicants for membership. If the applicant does not agree to discontinue noncomplying advertisements, and the component intends to deny the application for that reason, it can refer the case to the CDA's Membership Application Review Subcommittee. After its own review, the subcommittee recommends to the component that it grant or deny membership. Applicants who are new dentists have sometimes been offered conditional admission under which they must agree to bring their advertisements into compliance within a year. Since 1990, some dentists have been admitted on condition that the component "counsel" them about their advertising and that the dentist agree to comply with its advice.

## C. Proceedings Before the ALJ

The Commission's complaint against the CDA alleged that the organization applied its advertising guidelines in a way that restricted truthful, nondeceptive advertising.[2] It contended that this practice violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and consequently Section 5 of the FTC Act, 15 U.S.C. § 45. After a trial, the ALJ found that CDA had barred members from representing that their prices were "low," "reasonable" or "affordable." He also found that the CDA effectively prohibited across-the-board discounts by requiring dentists to post the nondiscounted price for all of the services subject to the discount. In both cases, the policy did not take into account whether the ads were false or misleading. In addition, he found that CDA restricted much advertising based on quality because it might imply superiority over other dentists and is difficult to verify. The CDA also considered money-back guarantees to be misleading and therefore impermissible.[3]

---

2. The complaint does not charge the CDA's component societies.

3. At one time, the CDA barred advertising that attempted to allay patients' fears (so-called "gentleness claims"). It has since changed its policy.

The ALJ concluded that the FTC had jurisdiction over the CDA's activities. Applying the FTC's decision in *In re Massachusetts Board of Registration in Optometry*, 110 F.T.C. 549 (1988) (*"Mass. Board"*), he held that the advertising restrictions were inherently suspect and lacked a plausible efficiency justification. Although he found that the CDA lacked market power, he held that a showing of market power was unnecessary under the *Mass. Board* standard. Consequently, he determined that the CDA had unreasonably restrained competition in violation of Section 1 of the Sherman Act and Section 5 of the FTC Act.

### D. Proceedings before the Commission

The majority of the Commission affirmed, on somewhat different reasoning. Chairman Pitofsky's opinion did not rely on *Mass. Board* but instead held that the restrictions on price advertising were unlawful per se.[4] It further held that the nonprice advertising guidelines were unlawful under an abbreviated rule of reason analysis. It disagreed with the ALJ and found that CDA possessed sufficient market power to justify a finding of anticompetitive effect. Commissioner Starek concurred in the result but would have applied the *Mass. Board* reasoning. Commissioner Azcuenaga dissented, arguing that there was insufficient evidence to anticompetitive acts and market power to hold CDA liable under Section 5 of the FTC Act. The CDA timely petitions for review.

### II. Standard of Review

■ We review the FTC's findings of fact and economic conclusions under the substantial evidence standard. *See* 15 U.S.C. § 45(c); *Olin Corp. v. FTC*, 986 F.2d 1295, 1297 (9th Cir.1993). Accordingly, we uphold them if they are based on "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id.* We do examine the findings of the full Commission more closely when they differ from those of the ALJ, however. *Litton Ind. v. FTC*, 676 F.2d 364, 369 (9th Cir.1982). We review issues of law de novo, but treat with some deference the FTC's informed judg-

ment that a particular commercial practice violates the FTC Act. *See FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015–16, 90 L.Ed.2d 445 (1986); *Olin*, 986 F.2d at 1297.

### III. Jurisdiction

■ As an initial matter, we address the FTC's jurisdiction over the CDA. The Commission has the authority to prevent "persons, partnerships or corporations" from engaging in unfair methods of competition and unfair or deceptive acts or practices. 15 U.S.C. § 45(a)(2). The question here is whether the FTC erred in finding that the CDA was a corporation within the meaning of the statute. The FTC Act's definition of corporation includes any company or association, "incorporated or unincorporated, without shares of capital or capital stock or certificates of interest, except partnerships, which is organized to carry on business for its own profit or that of its members." 15 U.S.C. § 44. As a nonprofit organization under California law, the CDA is an incorporated company without shares of capital. The FTC's authority thus turns on whether the CDA is organized to carry on business for its own profit or that of its members.

This court has not addressed the exact meaning of this language, and consequently the extent of the FTC's jurisdiction over nonprofit entities. The FTC has consistently held that it has jurisdiction over a nonprofit entity if a substantial part of the entity's total activities provides pecuniary benefits to its members. *See In re American Medical Assoc.*, 94 F.T.C. 701, 983–84 (1980), *aff'd*, 638 F.2d 443 (2d Cir.1980), *aff'd by an equally divided court*, 455 U.S. 676, 102 S.Ct. 1744, 71 L.Ed.2d 546 (1982) (*"AMA"*). It lacks jurisdiction, however, if the beneficial activities are merely incidental to noncommercial activities. *Id.*

Among the other circuits there is a split on the issue, and although the Supreme Court agreed to review the matter in *AMA*, it was equally divided and produced no opinion. *See* 455 U.S. 676, 102 S.Ct. 1744. The Eighth Circuit has held that a community

---

4. In the alternative, it held that they failed an abbreviated rule of reason analysis.

blood bank was outside the FTC's jurisdiction because it was run for charitable purposes, rather than for its own profit or that of its members. *Community Blood Bank v. FTC*, 405 F.2d 1011, 1022 (8th Cir.1969). The court held that the FTC has jurisdiction over an entity that engages "in business for profit within the traditional meaning of that language." *Id.* at 1018. Profit, the Eighth Circuit said, was gain from business or investment over and above expenditures. *Id.* at 1017. Alternatively, it defined the test as whether "dividends or other pecuniary benefits are contemplated to be paid to members." *Id.*

The Second and Seventh Circuit have applied a somewhat more expansive view of "profit." In affirming the FTC's decision in *AMA*, which involved an organization much more like CDA than the one in *Community Blood Bank*, it held that despite its many charitable functions, the AMA engaged in sufficient business activities to support jurisdiction. *See* 638 F.2d 443, 448 (2d Cir.1980). It distinguished *Community Blood Bank* as involving a purely charitable organization and focused on the fact that the FTC's cease and desist order concerned advertising, solicitation and contractual relationships, which relate to business rather than charitable functions. *Id.* The Seventh Circuit took a similar approach in *FTC v. Nat'l Comm'n on Egg Nutrition*, 517 F.2d 485, 487–88 (7th Cir.1975), which upheld jurisdiction over a trade association of egg producers. It relied on the fact that the association was intended to promote the general interests of the egg industry. It also found that the association was organized for the profit of the industry even though it pursued that profit indirectly—by trying to increase egg consumption and allaying fears about cholesterol. *Id.* at 488.

■ We agree with the approaches of the Second and Seventh Circuits and hold that the FTC possessed jurisdiction over this case. Given that Congress apparently did not intend to provide a blanket exclusion for nonprofit corporations, *see Community Blood Bank*, 405 F.2d at 1017, we think that the construction of the statute urged by CDA is too narrow. While we agree with the

Eighth Circuit that truly charitable organizations should be exempt from the FTC's reach, we would not exclude the many nonprofit corporations that conduct substantial commercial and related activities. They may not directly distribute "gain" to their members in the same sense as a for-profit corporation, but no genuine nonprofit entity does. The FTC's approach of looking at whether the organization provides tangible, pecuniary benefits to its members as a surrogate for "profit" is a proper way of deciding which nonprofit organizations are subject to its jurisdiction.

Under this standard, we are confident that the facts of this case support the FTC's jurisdiction. Like the AMA and the National Commission on Egg Nutrition, the CDA is engaged in substantial business activities that provide tangible, pecuniary benefits to its members. Many of the CDA's functions, such as marketing, and lobbying for insurance and Medicare reform, directly enhance the profits of member dentists. Other activities, such as continuing education and financing assistance, indirectly make members' practices more efficient and reduce their costs. Furthermore, the activities that are the subject of the FTC's order—the regulation of advertising and solicitation—relate particularly to the business affairs of its members. The FTC is not purporting to regulate the CDA's charitable or educational activities; as in *AMA*, the Commission is concerned with CDA behavior that directly affects the profitability of its members' practices. Under these circumstances, the FTC properly exercised jurisdiction over the CDA.

## IV. Analysis of the Advertising Restrictions

### A. Legal Standard

#### 1. Price Advertising

■ The Commission concluded that the CDA's restrictions on price advertising—namely, the effective ban on volume discounts and statements describing prices as "low" or "reasonable"—were per se violations of Section 1 of the Sherman Act and Section 5 of the FTC Act. We disagree with its use of per se analysis but sustain its alternative

conclusion that an abbreviated rule of reason analysis applies.

There is some support among older cases for the FTC's use of per se scrutiny. *See United States v. Gasoline Retailers Ass'n,* 285 F.2d 688, 691 (7th Cir.1961) (finding ban on price signs to be part of conspiracy to stabilize prices). In recent cases, however, per se analysis has only applied to price fixing, output limitations, horizontal market divisions, tying, and group boycotts. *See American Ad Management, Inc. v. GTE Corp.,* 92 F.3d 781, 784 (9th Cir.1996). The Supreme Court, and this court, have been unwilling to expand the categories of conduct subject to the per se prohibitions. *See NCAA v. Bd. of Regents of Univ. of Oklahoma,* 468 U.S. 85, 100, 104 S.Ct. 2948, 2959–60, 82 L.Ed.2d 70 (1984); *American Ad Management,* 92 F.3d at 784–85. This is especially true where the economic impact of the restraint is not immediately obvious, *see Indiana Federation of Dentists,* 476 U.S. at 458–59, 106 S.Ct. at 2017–18, and where the restraint is a rule adopted by a professional organization. *See National Soc'y of Professional Engineers v. United States,* 435 U.S. 679, 692–96, 98 S.Ct. 1355, 1365–68, 55 L.Ed.2d 637 (1978).

We do not doubt that the FTC has gained considerable experience with advertising restrictions since *AMA. See Mass. Board,* 110 F.T.C. at 549. It may be correct that some types of price advertising restrictions amount to bans on price competition that warrant per se condemnation. *See Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982) ("Once experience with a particular kind of restraint enables the court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable."). But we cannot endorse the use of per se analysis in this case, which concerns a set of ethical guidelines promulgated by a professional organization for the apparent purpose of preventing false and misleading advertising. Unlike the situation in *AMA* and *Mass. Board,* the CDA's policies do not, on their face, ban truthful, nondeceptive ads. The allegation instead is that the rules have been enforced in a way that restricts truthful advertising. The value of restricting false advertising (which may itself violate the FTC Act) counsels some caution in attacking rules that purport to do so but merely sweep too broadly. As a result, we do not believe that this type of restriction warrants per se condemnation without further inquiry into its effects on competition.

We therefore analyze the restraints under the rule of reason, which requires balancing the anticompetitive effects and possible efficiency gains or business justifications of the challenged practice. *See Professional Engineers,* 435 U.S. at 691, 98 S.Ct. at 1365. In this case, the FTC applied an abbreviated, or "quick look," rule of reason analysis designed for restraints that are not per se unlawful but are sufficiently anticompetitive on their face that they do not require a full-blown rule of reason inquiry. *See NCAA,* 468 U.S. at 109–10 & n. 39, 104 S.Ct. at 2964–65 & n. 39 ("The essential point is that the rule of reason can sometimes be applied in the twinkling of an eye." (internal quotations omitted)). It allows the condemnation of a "naked restraint" on price or output without an "elaborate industry analysis." *Id.* at 109, 104 S.Ct. at 2964. Although we have held that the quick look analysis should be the exception, rather than the rule, *see American Ad Management,* 92 F.3d at 789, we conclude that the FTC properly applied it here.

The restrictions CDA placed on price advertising amounted in practice to a fairly "naked" restraint on price competition itself. As the Commission and courts have found, price advertising is fundamental to price competition—one of the principal concerns of the antitrust laws. It plays an "indispensable role in the allocation of resources in a free enterprise system." *Bates v. State Bar of Arizona,* 433 U.S. 350, 364, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 (1977). Restrictions on the ability to advertise prices normally make it more difficult for consumers to find a lower price and for dentists to compete on the basis of price. *See id.; Morales v. Trans World Airlines,* 504 U.S. 374, 388, 112 S.Ct. 2031, 2039, 119 L.Ed.2d 157 (1992). This is particularly true of a restriction on advertising

price discounts, a significant basis of price competition. *See Mass. Board,* 110 F.T.C. at 605.

The complexity in this case is that CDA asserts as justification for its restrictions the legitimate, indeed procompetitive, goal of preventing false and misleading price advertising. In particular, it claims, the rules simply require more disclosure, which enhances rather than limits price competition. We agree that as a general matter disclosure can augment competition and increase market efficiency by providing consumers more information. The problem is with the nature and amount of disclosure required. As the Supreme Court has recognized in other contexts, disclosure requirements can become so onerous that they actually stifle the information that consumers receive. *Morales,* 504 U.S. at 389–90, 112 S.Ct. at 2039–40. In practice, CDA's disclosure requirements appear to prohibit across-the-board discounts because it is simply infeasible to disclose all of the information that is required. Indeed, the record provides no evidence that the rule has in fact led to increased disclosure and transparency of dental pricing. Consequently, we do not think this possible justification, on these facts, requires more than a quick look under the rule of reason.

### 2. *Nonprice Advertising*

■■ The Commission also applied the quick look rule of reason analysis to the nonprice restrictions, such as the effective ban on quality and superiority claims. These restrictions are in effect a form of output limitation, as they restrict the supply of information about individual dentists' services. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 1505 at 693–94 (Supp.1997). Limiting advertisements about quality, safety and other nonprice aspects of service prevents dentists from fully describing the package of services they offer, and thus limits their ability to compete. The restrictions may also affect output more directly, as quality and comfort advertising may induce some customers to obtain nonemergency care when they might

not otherwise do so. CDA contends that claims about quality are inherently unverifiable and therefore misleading. While this danger exists, it does not justify banning all quality claims without regard to whether they are, in fact, false or misleading. Under these circumstances, we think that the restriction is a sufficiently naked restraint on output to justify quick look analysis. We also note in this regard the Supreme Court's repeated holdings that the scope of inquiry under the rule of reason is intended to be flexible depending on the nature of the restraint and the circumstances in which it is used. *See Indiana Federation of Dentists,* 476 U.S. at 459, 106 S.Ct. at 2018; *Professional Engineers,* 435 U.S. at 688, 692, 98 S.Ct. at 1363–64, 1365–66.

### B. Substantial Evidence

■■ CDA challenges whether substantial evidence supports the FTC's conclusion that CDA's policies violated the rule of reason. Finding a violation under the rule of reason requires a showing of (1) an agreement, conspiracy or combination between two or more entities, (2) intent to restrain competition, (3) actual injury to competition, and (4) an unreasonable restraint as determined by balancing the harm caused by the restraint and any procompetitive benefits from it.[5] *American Ad Management,* 92 F.3d at 788–89. In particular, CDA contends that the Commission has not produced evidence that there was an agreement with the intent to restrain trade, that CDA in fact restricted truthful, nondeceptive advertising, and that CDA had sufficient market power for its regulations to actually harm competition.

### 1. *Agreement*

■■ CDA first argues that there was no evidence of an agreement in restraint of trade. We disagree. Professional associations are "routinely treated as continuing conspiracies of their members." *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500, 108 S.Ct. 1931, 1937, 100 L.Ed.2d 497 (1988) (quoting 7 P. Areeda,

---

**5.** The restraint must also affect interstate commerce, but the parties do not address this issue

on appeal.

Antitrust Law ¶1477, at 343 (1986)). CDA members are independent, profit-seeking dentists in competition with each other. By joining the CDA, they effectively agree to abide by the CDA's Code of Ethics. CDA's advertising policies and accompanying enforcement activities thus constitute a combination or agreement within the meaning of Section 1 of the Sherman Act.

### 2. Intent

 CDA further argues that it did not intend to restrain trade. Instead, it contends, the purpose of the Code of Ethics was merely to comply with state law. But whatever its motivation, the point of the advertising policy was clearly to limit the types of advertising in which dentists could engage, and thereby restrict a form of competition. "Good motives will not validate an otherwise anticompetitive practice." *NCAA,* 468 U.S. at 101 n. 22, 104 S.Ct. at 2960 n. 22.

### 3. Effect of Restrictions

 A more difficult question is whether substantial evidence supports the Commission's conclusion that CDA in fact restricted truthful, nondeceptive advertising. On its face, the Code only extends to false and misleading advertisements. The Commission found that through its pattern of enforcement, the CDA went beyond the literal language of its rules to prohibit ads that were in fact true and nondeceptive.[6] The CDA's advisory opinions and guidelines indicate that across-the-board discounts and descriptions of prices as "reasonable" or "low" do not comply with the Code. Although these guidelines are not directly binding on member dentists, the Commission staff presented evidence that the CDA has relied on them in making decisions about members' advertising on appeals from disciplinary decisions by component societies and on review of membership applications referred by components. In numerous cases, the CDA advised components that advertising did not comply be-

cause it included "reasonable" or "affordable" language.

Similar evidence supports its findings on the issue of discounts. Although Dr. Kinney, one member of the Judicial Council, testified that the guidelines might not bar all across-the-board discounts, other testimony is to the contrary. For example, one member suggested that advertising a senior citizen discount, standing alone, would violate the rules. The Commission's opinion cites numerous cases in which the CDA advised members of objections to special offers, senior citizen discounts, and new patient discounts, apparently without regard to their truth. It may be that there is some confusion even within the CDA about the extent to which truthful price advertising is restricted. But there are enough examples of CDA objections to truthful ads to find that substantial evidence supports the FTC's conclusion.

In terms of the nonprice advertising, advisory opinion eight expressly states that claims as to the quality of services are inherently likely to be false or misleading. The evidence before the ALJ demonstrates that the CDA, following this guideline, has often advised components that the Code of Ethics bars such claims, without any inquiry into whether or not, in a particular case, they were true. On numerous occasions, CDA also informed its components that guarantees were barred by state law. Taken together, there is sufficient evidence that the CDA restricted nonprice advertising without any particular consideration of whether it was true or false.

### 4. Market Power

 Showing that the restraints harmed competition under the rule of reason typically requires some analysis of market power. Although the Commission did not engage in a detailed analysis of market power, and its conclusions on this issue conflict with those of the ALJ, we conclude that they suffice under the quick look rule of reason in light of

---

6. CDA also contends that any anticompetitive harm was caused by the independent actions of its components, over which it had no control. But CDA set the overall standards used by the components and in numerous cases cited by the

Commission was directly involved in disciplinary and admission proceedings for individual dentists. There was enough evidence to conclude that CDA itself was responsible for the anticompetitive activity.

the nature of the restraints involved. The FTC correctly concluded that the relevant product market is dentistry and the relevant geographic market is local. The fact that approximately 75 percent of licensed dentists in California belong to the CDA is fairly strong evidence of market share. While this fact alone does not indicate what the market shares are in particular localities, it strongly suggests that at least in many, CDA's market share is quite high.

The Commission also found that there are significant barriers to entry in the form of licensing and education which tend to convert this market share into market power. In addition, CDA membership offers sufficient benefits that exclusion appears to present a significant hardship for some dentists. CDA membership is necessary for membership in the ADA, which itself provides prestige and valuable benefits. The record does not show that dentists are willing to forego CDA membership rather than give up their advertisements. In fact, some dentists stated they feared losing the economic benefits of membership, such as insurance, if they were expelled or denied membership because of advertising. Even if the benefits from membership can be obtained elsewhere, their availability in a single package from CDA certainly gives CDA an edge over other options. Taken together, these circumstances suggest that CDA possesses enough market power to harm competition through its standard setting in the area of advertising.

It is true that the FTC did not engage in the full economic analysis of market power often required under the full rule of reason. But as Professor Areeda argues, "What constitutes sufficient proof [of market power] will vary enormously both with the type of restraint and with common knowledge. ... If large scale professional organizations like the American Medical Association promulgate rules against advertising, a court will see a significant restraint that needs to be analyzed without careful market definition." 7 P. Areeda, Antitrust Law ¶ 1503, at 377. Given the facially anticompetitive nature of both the price and nonprice advertising restrictions, the evidence of the CDA's large

market share and influence justifies finding a violation under the quick look rule of reason.

**Conclusion**

The FTC correctly exercised its jurisdiction over the CDA. Substantial evidence supports the FTC's conclusion that the advertising rules of the CDA, as applied to truthful and nondeceptive advertisements, violate Section 1 of the Sherman Act and Section 5 of the FTC Act under an abbreviated rule of reason analysis. Accordingly, we AFFIRM the decision of the FTC and ENFORCE its cease and desist order.

REAL, District Judge, dissenting.

I dissent.

The history and background of this matter has been well delineated by the majority so I need not repeat it here.

I dissent because I believe that the California Dental Association (CDA) is a nonprofit professional association that does not operate commercially. Rather the CDA simply makes available to its members services that can best be provided through a group in order to obtain the best price and service from outside business enterprises; i.e., insurance companies, equipment suppliers, telephone services, auto leasing and financing. The CDA has nothing to do with competition in the dental profession. As such the California Dental Association is not subject to the authority of the Federal Trade Commission. *Community Blood Bank of Kansas City Area, Inc., v. F.T.C.,* 405 F.2d 1011 (8th Cir.1969). These non-profit membership organizations have no place in the commercial world of the F.T.C. The majority appears to base their F.T.C. jurisdictional ruling on "pecuniary benefits" that do not in any way result from the business of the Association but rather from the individual action of the members in group procurement to obtain the best price from outside sources that compete for their business. The members are true consumers of competitive products offered to them through their group—the CDA.

Assuming arguendo that the F.T.C. has jurisdiction to regulate the CDA, the majority's approval of the quick look analysis to the Rule of Reason used by the F.T.C. cannot be

supported. The rules of the CDA as presented to the F.T.C. are not per se a restraint on competition in the dental profession nor are they sufficiently anti-competitive on their face to eschew a full-blown rule of reason inquiry.

What the CDA was attempting to accomplish by its rules concerning advertising did not amount to a restraint on price competition. In its efforts to self-monitor the dental profession in the relationship of its members to the public, the CDA was attempting to guard against misleading or unreliable advertising by its members. What the CDA was monitoring was that dentists who wishes to advertise discounts would have to fully disclose to the public the nature of the discounts. Full disclosure is neither price fixing nor is it a ban on non-deceptive advertising. The advertising provisions of the CDA's Code of Ethics does not in any way infringe upon the rights of any member to advertise providing the advertising is not "false or misleading in any material respect." If Section 10 of the Code is applied erroneously to any member's advertising there are provisions to appeal the decision to the CDA Judicial Council, and of course ultimately to the courts of the State of California.

The majority agrees that, at worst, a Rule of Reason inquiry is applicable to the anti-competition claims of the F.T.C. They also agree that the Rule of Reason is the "rule" and that the quick look is the exception. Yet in the absence of any naked restraints they still attempt to satisfy the use of the exception. Furthermore, the majority finds a restraint on competition without the supporting help from any of the economic principles to be applied to a full market power analysis.